# SUPREME COURT — APPELLATE DIVISION — THIRD DEPARTMENT.

## May 5, 1920.

## THE PEOPLE v. C. EDWARD CHAPMAN.

(191 App. Div. 660.)

(1) ARSON—SLIGHT ERRORS WILL NOT BE DISREGARDED IN DOUBTFUL CASES—EVIDENCE.

On an appeal from a conviction for the crime of arson where it appears that the prosecution has failed to make a very clear case against the defendant, the court is not at liberty to consider errors as unimportant which under other circumstances might be disregarded.

(2) SAME—EVIDENCE—STATEMENTS OF PERSON AS TO CONDITIONS IN BURNING BUILDING NOT ADMISSIBLE AS PART OF RES GESTAE.

Evidence was not admissible, as part of the *res gestae*, as to the statements made by a man who entered the burning house and received burns from which he soon died, as to the conditions that he observed therein, as he was away from the fire at the time and a substantial time had elapsed between the occurrence and the statements and they were made in response to questions by third persons.

APPEAL by the defendant, C. Edward Chapman, from a judgment of the County Court of the county of Washington rendered on the 28th day of May, 1919, convicting him of the crime of arson in the third degree.

*Fred A. Bratt* (*Lawrence B. McKelvey* of counsel), for the appellant.

*Wyman S. Bascom, District Attorney,* for the respondent.

WOODWARD, J.:

The defendant was charged in the indictment as follows: That the defendant on July 24, 1918, " did wilfully and feloniously set on fire and burn a certain vacant dwelling house "

belonging to the defendant in the town of Fort Edward. The defendant was put on trial before the Washington County Court and a jury on the 26th day of May, 1919, at Hudson Falls, N. Y., and was convicted of the crime as charged. The learned county judge before whom the case was tried has granted a certificate of reasonable doubt and admitted the defendant to bail, and appeal comes to this court.

The learned court below, in its certificate, says that the " particular rulings believed to have been erroneous, together with any other grounds upon which it is granted, are as follows: I have doubt as to the correctness of the court's ruling in admitting the declarations of Robert Graham. Also as to the court's ruling in denying the defendant's motions to dismiss the indictment, and for a direction of a verdict of acquittal."

It is not to be doubted that the vigilant district attorney of Washington county has surrounded the defendant with a number of suspicious circumstances, but it seems to us that he has failed to make it very clear that the crime was actually committed by the defendant. Under such circumstances we are not at liberty to consider errors as unimportant which under other circumstances might be disregarded. (See Code Crim. Proc., § 542.) It is possible that the defendant actually committed the crime with which he is charged, but the evidence. does not exclude a practically even chance that he may be innocent. The defendant had sold certain premises in the town of Fort Edward to the Standard Oil Company, apparently to be used in connection with its distributing station. He had reserved from such sale a building occupied by himself as a dwelling and which, according to the respondent's counsel, was lacking in artistic conception and execution. It was described as resembling two enormous packing cases, sitting one on top of the other, and counsel says in his brief: " That it was a monstrosity may well be imagined," and it is of such characterization as this that much of the case against the defendant is builded. Emphasis is laid on the fact that the defendant is

" a plumber and not a carpenter," and that he was an inventor, the suggestion being made that, because of this fact, he might have contrived an apparatus to start the fire, which occurred at midnight on the 24th day of July, at a time when the defendant and his wife were concededly twenty miles from the premises. The defendant claimed that he had intended moving this " monstrosity " across the street, to join it with another house owned by him at that point, and it cropped out in the evidence that the neighbors were opposed to this; that some of them had gone so far as to suggest that they would burn the " monstrosity " before they would submit to having it moved and placed as desired by the defendant, and it is the theory of the respondent that the defendant, having an insurance of $500 on the building, and being confronted with the difficulties of moving the " monstrosity " and a short period of time in which to accomplish this result, set fire to the property with a view to realizing upon the insurance. It was conceded by the People's witness that the house was worth $500 for moving; the evidence is uncontradicted that the defendant had made arrangements with a contractor for the removal of the building but that the work had been delayed on account of the contractor's other engagements, and that the contractor was actually to have commenced the work on the morning following the fire. Men do not usually accept the risks of committing a crime of the gravity of arson for the purpose of selling property of the actual value of the insurance upon the premises, and all that the defendant had said and done in reference to the removal of this building was consistent with his rights; was consistent with that innocence which the law presumes. (Code Crim. Proc., § 389.) Any good citizen might have done all that the defendant is shown to have done in this regard and have been fully justified, and the fact that the fire occurred does not of itself justify the conclusions that these perfectly innocent acts were but the cover for an intended crime. The evidence does not exclude the idea of innocence in this regard.

But there were other suspicious circumstances. When the fire alarm was turned in, on the night of July 24th, one of the fire companies discovered, after the fire truck was put in motion, that the gasoline had been shut off from the motor, and the apparatus was delayed some minutes while this was being discovered and remedied, and it was shown that the defendant, who was a member of this particular company, had been in the garage about 9 o'clock in the evening looking for some waste to wipe his hands, which he said he had dirtied in fixing the oil in his own car. This was a suspicious circumstance; it was emphasized, perhaps, by the proof that there was a lavatory with hot and cold water which the defendant might have used, but it is minimized by the fact that the defendant was only in the garage for a short time, just about long enough to do the errand that he suggested, and that the garage was unlocked at all times and accessible to persons generally, and, so far as we are able to gather from the record, there was no particular reason why the defendant might not have entered the garage without the knowledge of anyone if he had intended to do what the jury was asked to infer he did do. There was no evidence of how long the motor had been standing in the garage without use; no time is fixed when the gasoline was shown to be in position to flow, and with all the possibilities that the gasoline may have been shut off accidentally, or in the inspection or repair of the motor truck, or in many ways that might be suggested, it is permitting a jury to guess a good deal when they draw the inference that the defendant deliberately disabled the motor.

There is evidence, likewise, that when the firemen reached the scene of the fire that they found the cap-nuts of two of the water hydrants displaced, so that the ordinary wrenches carried by the firemen would not open them; and one woman testified that at about 4 o'clock on the morning previous to the fire she saw a man, whose general makeup corresponded to that of the defendant, in the vicinity of these hydrants. She refused to identify the defendant as this man, saying it was too dark to

distinguish him, though he was coming toward her at one time. She does not claim that she saw him touch the hydrants, that she even saw him at a point where he could touch them; he was simply in the general neighborhood of the hydrants and turned and walked out of the range of her vision. But the defendant was a plumber, and of course he could take off these nuts, just as any other man could do with a monkey-wrench; and the fire occurred the night following. The circumstances are suspicious, but they do not show that the defendant was the man who was there, nor does it appear that the man whom this witness saw was actually engaged in putting the hydrants out of working order.

The house was dismantled; everything was in shape for the proposed moving. The defendant's wife was in a delicate condition and gave birth to a child soon afterward. They, in company with the defendant's wife's sister and another lady, apparently at the suggestion of the wife's sister, started some time after 9 o'clock in the evening for a drive and arrived at the home of a friend some twenty miles away, where, after urging, they remained over night and started for home early the next morning, stopping on the way at the home of the contractor who was to move the building, and there learning of the fire. These things are suspicious circumstances, and yet there is no act on the part of the defendant which is clearly established which is not as consistent with innocence as with guilt.

Just how the fire started is not known. The only person who is shown to have been present in the building in the immediate moment of the discovery was Robert Graham, a watchman for the Standard Oil Company whose property immediately adjoined the building. The defendant's wife was there some time between 9 and 10:30, the exact time being in dispute, but the evidence is wholly uncontradicted that the defendant was not there after 7:45 in the evening, so that if the defendant is responsible for the fire he must have used his inventive

faculties to produce a fire at least four hours after he was at the premises, unless he made use of his wife in some way, and there is no evidence of any act on her part in this regard.    There is some evidence of an explosion in connection with the fire, but all the testimony relating to the explosion shows that it occurred after the fire was well under way, so that the reflection of the light was seen at a considerable distance away, and the character of the explosion seems quite indefinite in the minds of the witnesses, and it apparently was something like a gun or pistol shot, but we find no evidence of any fragments of a bomb or anything of that character, and except for the declarations of Robert Graham, alleged to have been made in response to questions addressed to him after he had been removed from the premises to a neighboring house, and received as a part of the *res gestæ,* the cause of the fire is enveloped in mystery.    It was established that Graham was seen to jump from the burning building with his clothes all ablaze, and that he died shortly afterward in the hospital as a result of his injuries.    The district attorney interrogated one of the People's witnesses, Jennie Kelleher, in reference to the tragic details, and then asked her (referring to Graham): "What did he say there in your presence?"    Counsel for defendant objected on the ground that the testimony was incompetent, hearsay, not in the presence of the defendant; that it was from a man not shown to have been contemplating death, and that it was no part of the *res gestæ.*    The objection was overruled and the defendant excepted.    The witness answered: "He said he saw a small light and burst in one of the doors and rushed upstairs and found part of a mattress lying on the floor; picked it up and ran to the window, and when he went to throw it out something exploded and blew the flames all over him."    Another witness, Edward Kelleher, over the same objection and exception, testified as to the same circumstances, that Graham was brought into his house and that he (the witness) asked Graham what happened, and that Graham said: "I went in the house

and it all went like that and I got all burned before I got out; I had to jump." This witness again described the horrible condition of Graham, and under further questioning said that Graham said that " he seen a light in the house; " that he then went in and before he got out it was all ablaze. Counsel endeavored to bring out from this witness that Graham referred to the mattress, but was unable to do so, though the manner of the question and the surroundings were such as to induce the jury to place credence upon the theory that there was a mattress which had been arranged to explode, which, in connection with the emphasis upon the alleged inventive talents of the defendant, helped to patch up a theory·that he must have been guilty.

The learned court held that the evidence was not admissible as that of a dying declaration; that the necessary conditions did not exist, but permitted its inclusion upon the theory that it was a part of the *res gestœ*. But the conceded facts show that it was not properly received under that rule. The rule is that the distinction to be made (between an admissible and an inadmissible declaration) is in the character of the declaration; whether it be·so spontaneous, or natural, an utterance as to exclude the idea of fabrication; or whether it be in the nature of a narrative of what had occurred. " In the present case," say the court in People v. Sprague (217 N. Y. 373, 378, 379), " ' the declaration of the deceased was not spontaneous; it was called forth by the inquiry as to " what had happened " and was, distinctly, narrative.' (Greener v. General Electric Co., 209 N. Y. 135, 138.) In the case we are now considering the declaration was not so spontaneous or natural as to exclude the idea that it was the outgrowth of the threat made to the deceased by the appellant that he would get a gun and shoot him, or the idea that the deceased fabricated it. The space of time between the shooting and the declaration was considerable. The distance traveled by the deceased in going to the doorway, where the declaration was made, from where he was when shot, was substantial. The declaration was called forth by

the inquiry : ' What is the matter,' and was distinctly narra-
tive. The declaration made under such conditions was wholly
untrustworthy and should not have been received." This is
substantially the condition presented in the instant case. The
witness says that Graham was upon his piazza and that after
he had telephoned the fire department he ran out and asked
Graham what happened, and Graham is alleged to have given
the explanation above narrated. He was away from the fire,
and a substantial time had elapsed, and he merely gave his
version of what had happened, not under oath and not with
the solemnity which gives character to a dying declaration. It
was a little more dramatic, a little more likely to prejudice a
jury than the narrative of some John Smith who was not in-
jured, but it had no more place in the legitimate trial of the
issues involved than the hearsay declarations of any other
unsworn person, and it was error to permit it to go to the jury.

It is very doubtful if the jury would have reached a verdict
of guilty upon the testimony before them except for this declara-
tion on the part of Graham ; very doubtful if the court would
not have been justified in directing a verdict without this
alleged fact in the case, and as it had no legitimate place in the
case, it is the duty of this court to reverse the judgment.

The judgment appealed from should be reversed.

All concur ; JOHN M. KELLOGG, P. J., in the result.

Judgment of conviction reversed and new trial granted.