## COURT OF APPEALS,
### March 16, 1909.

## THE PEOPLE v. PACY HILL.

(1). MURDER—INSANITY.

On examination of the evidence, both as to the commission of the crime of murder by defendant and as to his mental condition at the time of the crime was committed, *held*, that the question of defendant's guilt and of his mental responsibility were for the jury and that. the evidence sustains the verdict rendered.

(2). SAME—DECLARTIONS OF DEFENDANT,

Declaration of a defendant made to a physician as to his recollection of transactions after alleged homicide, which transactions were long before the time of the interview with the physician, are not competent for the purpose of showing the mental state of the defendant at the time of such interview.

(3). SAME—EVIDENCE—QUESTION AS TO WHETHER ACTIONS OF DEFENDANT WERE RATIONAL OR IRRATIONAL.

A question to a witness, who has testified to transactions and interviews, which is based upon the statements and acts sworn to by him, and which calls upon him to state how such statements and acts impressed him at the time, whether rational or irrational, is in the form sanctioned by the authorities.

(4). SAME.

The district attorney asked a witness, " Will you characterize the acts, conduct and conversation which you had and which you have testified to, as to whether they were rational or irrational? " This was objected to upon the ground that it did not appear that the witness formed any impression at the time. The objection was overruled and the witness answered " Rational." *Held*, that the jury was not misled; that the question necessarily involved the impression of the witness, and permitting it to be answered in that form was not such error as to require reversal.

(5). SAME—EXAMINATION OF DEFENDANT BY EXPERT.

An expert for the People examined defendant, stating to him that he had been requested by the district attorney so to do. He asked him to be free and frank with him, stating that he would use him right and that he need not tell him anything that would incriminate himself as

far as the deed was concerned. *Held*, that this was not an offer by which defendant was induced to make statements upon the understanding that the expert would not testify against him and that no error can be predicated thereon.

APPEAL from a judgment of the Supreme Court, rendered June 18, 1908, at a Trial Term for the county of Cattaraugus, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*George A. Larkin*, for appellant. The admission of the evidence of Manley Frank, characterizing defendant's acts as rational instead of showing the impression they made upon him, was error. *Matter of Myer*, 184 N. Y. 54; *People v. Pekarz*, 185 N. Y. 481; *People v. Silverman*, 181 N. Y. 243; *Clapp v. Fullerton*, 34 N. Y. 190; *Real v. People*, 42 N. Y. 270; *People v. Conroy*, 97 N. Y. 62; *People v. Spencer*, 179 N. Y. 408. It was error to permit Dr. Krauss to relate statements made to him by the defendant. *People v. Furlong*, 187 N. Y. 198.

*George W. Cole*, for respondent. The evidence established beyond any reasonable doubt, and the jury properly found, that the defendant was mentally responsible. Penal Code, § 17; *People v. Brotherton*, 75 N. Y. 159; *People v. Spencer*, 179 N. Y. 408; *People v. Furlong*, 187 N. Y. 198; *People v. Koerner*, 154 N. Y. 355; *People v. Koerner*, 117 App. Div. 40, 191 N. Y. 528; *People v. Egnor*, 175 N. Y. 419. The testimony of Manley Frank, characterizing the acts and conduct of the defendant, was proper. *People v. Pekarz*, 185 N. Y. 480; *Clapp v. Fullerton*, 34 N. Y. 190; *People v. Conroy*, 97 N. Y. 62; *People v. Spencer*, 179 N. Y. 408; *People v. Packenham*, 115 N. Y. 408; *Paine v. Aldrich*, 133 N. Y. 544; *Hewlett v. Wood*, 55 N. Y. 634; *People v. Youngs*, 151 N. Y. 210. The examination of the defendant at the sheriff's office by Dr.

Krauss, the People's expert, was properly proven. *People v. McCallam,* 3 N. Y. Cr. Rep. 189; *People v. Rogers,* 192 N. Y. 331; *People v. Furlong,* 187 N. Y. 198.

HAIGHT, J.:

The defendant, Pacy Hill, has been convicted of the crime of murder in the first degree committed at the city of Olean, Cattaraugus county, on the 18th day of March, 1908, by inflicting two bullet wounds, one in the hand and the other in the breast of Chloa Hancock, from the effects of which she died on the 21st day of March thereafter.

The facts constituting the crime are without substantial controversy. The evidence tends to show that the defendant was a man forty-one years of age who had previously been married, but his wife had been dead seven years. Much of the time after the death of his wife the defendant resided with William Hancock, whose family consisted of his wife, daughter Chloa and three sons. Mrs. Hancock was an aunt of the defendant, and her daughter Chloa was his cousin. At the time of her death she was nearly eighteen years of age and perfectly developed. The defendant had, during the time that he made his home in the Hancock family, been very kind and attentive to Chloa and on several occasions had taken her upon excursions and visits to their relatives. It is quite apparent that he had become very much attached to her and, to use his own expression, "he thought his eyes of her." Prior to his becoming a resident of the Hancock home he drank liquor to some extent, but after entering the family he was scolded by his aunt and thereafter refrained from the use of liquor for nearly the entire time that he remained there. It, however, appears that on the day before the homicide he had drunk some, so that it was observed by Mr. Hancock and some others. At the evening meal on that day he inquired of Chloa if she was going up town that evening; she replied that she was, with a friend of hers by the

name of Maud Murtaugh. The defendant then said, "If you girls will go with me, I will take you to Dreamland." She replied, " All right," and then asked her father if he was going up town, to which he replied he was, and she then said to him, " You can go along with us." After the close of the meal the defendant, with Hancock and Chloa, started and walked as far as Maud's residence, where Chloa stopped and went into the house, asking the defendant where they would find him when they came up town. He replied that he would wait for them up near the Star Theater. The defendant and Hancock then went on up town, Hancock going to his office, where he remained until about ten o'clock and then returned home. Chloa got her friend Maud and they started out, met a young man, who walked with them through various streets of the town until about ten o'clock, when Maud was left at her residence and Chloa returned home, but whether she had company from Maud's residence home does not appear further than that talk was heard between persons outside of the house before she entered, from which, perhaps, the inference may be drawn that she did have company home. She entered the house shortly after the arrival of her father, and a few minutes thereafter the defendant entered and immediately went to his room. He arose at six o'clock in the morning, left the house without his breakfast and remained absent some considerable portion of the forenoon. He, however, returned in time for the midday meal. Hancock was also home for luncheon, but returned to his work at two o'clock, leaving the defendant and his daughter Chloa alone in the house. About three-quarters of an hour afterward, Chloa ran into the house of her neighbor, Mrs. Kent, appearing very pale and excited. She remained for a time, and then, on the return of Mr. Kent, she had a talk with him, and thereupon Kent went into her house, got her coat, hat and purse, and brought them out to her. The defendant stated to the chief of police that he got her into a room and made some improper

remarks to her, which she rejected, and that then he undertook to use force, but she fought him off and got away and left the house.   After she had left, he went to Hancock's bureau, there found his revolver and took it.   The defendant appears to have remained in the house until after Mr. Kent entered and got Chloa's coat and hat and then he walked up to the Kent house and rapped.   The door was opened by Mrs. Kent and he inquired for Chloa, but was told that she had gone up town.   He then returned to the Hancock house.   As he did so Mrs. Kent thought that he staggered a little in his walk.   Chloa's brother, Bert Hancock, returned home from his work about 4.45 p. m. He found the door fastened; he rapped and after waiting awhile the defendant came and opened it for him.   After he entered he inquired where his sister was and the defendant stated that he did not know.   Shortly after Chloa returned, but before she entered the house the defendant went out and met her and had some conversation with her.   The brother, while hearing their voices, could not distinguish what they were saying.   Thereupon Chloa came into the house and the defendant followed her about ten feet behind and walked into the parlor.   Chloa entered the kitchen and removed her coat, then taking it into the parlor laid it on the back of a chair.   The defendant was sitting there in a chair but they said nothing to each other. As she came out of the parlor she asked her brother where her valentine was.   It appeared that some days before she had received a valentine from a young man, described as representing flowers upon a plush backing, which apparently was highly prized by her.   Her brother replied that he saw it in the back yard partly burned.   She then went through the kitchen and opened the door and looked into the yard, saw it, and came back and said that she would tell her father that she would not be used in that way any more.   She then came to the sewing machine and reached over it for something, and, as she did so, the defendant came from the parlor and said to her, " Father

will see about that, will he? We will see who will see about that." Thereupon he fired two shots at her about two or three seconds apart, one shot taking effect in the hand and the other in the chest. The brother was seated in a chair when the first shot was fired, but sprang from it and grabbed the defendant's hand, but not until after he had fired the second shot. He then wrenched the pistol from his hand and Chloa ran through the kitchen out of the back door and over to Kent's house. After the brother had snatched the pistol from the defendant's hand the defendant demanded its return, but the brother also ran after his sister over to Kent's. It appears that a policeman was passing the house at about that time, who immediately entered and arrested the defendant.

The defendant's statement, with reference to the shooting, is to the effect that, after he got the pistol from Hancock's bureau, he made up his mind he would have a talk with her before she saw her father and told him, and that when she came back he approached her and asked her if she was going to tell her father, and she said, "Yes." He also stated that at the time he shot her he said to her, "I will see who tells Papa." It appears that Chloa lived three days after the shooting and that she made a statement in the form of an affidavit, but of course it was not admissible in evidence. The statement of the defendant to the chief of police is corroborated by the testimony of other witnesses in several particulars. She did run away from the house after he had attempted force and was pale and excited, as appears from the testimony of Mrs. Kent. Evidently she did not dare to return for her coat and hat, as appears from the fact that Mr. Kent entered the house and procured those things for her. The fact that the defendant got the revolver from the bureau drawer is corroborated by the testimony of Hancock, to the effect that the revolver was there before he left the house and the next morning on examining the drawers of the bureau he found that his linen had been

moved about and displaced and that the revolver was gone.　He identified the revolver which the brother Bert Hancock had taken from the defendant as the revolver that he had in the drawer at that time.　As to the valentine, it appears that she kept it upon the table in the parlor and that it was there before she left the house that afternoon.　It had been burned in part and thrown out upon the ash heap before the return of the brother, and inasmuch as the defendant only was left in the house it is consequently claimed that it was destroyed by him. The theory of the prosecution is to the effect that the defendant had become greatly attached to the girl; that he had become jealous by reason of her great delight in receiving the valentine from the young man and that her failure to keep her appointment with him the night before and the accepting of the company of another man instead had greatly offended him; that in afternoon of the following day, when he was left alone with her, he made to her an improper proposal, which she rejected, and that thereupon he attempted by force to carry out his proposal, but in doing so she succeeded in fighting herself out of his grasp and fleeing from the house.　He then, fearing that she was going to tell her father of his assault upon her, went to the bureau, succeeded in finding the revolver, and then, with deliberation and premeditation, determined to have an interview with her on her return, and in case she persisted in telling her father, to use the revolver.　This, in substance, was the question presented to the jury upon this branch of the case. There appears to have been a slight conflict between the statement of the defendant and the brother, who was an eye-witness to the shooting.　The defendant evidently had in mind the fact that she had threatened to tell her father of his assault in the afternoon.　The brother had just told her of the destruction of her valentine, and she had opened the door and saw it outside.　As she returned she made the remark that she was going to tell her father that she would not be used in that

way any more. It must be borne in mind that the defendant was then seated in the parlor, another room, and that he evidently overheard her expression to the effect that she was going to tell her father, for immediately thereafter he arose, stepped out of the parlor into the room in which she and her brother were, making the statement, "I will see who tells Papa," and then fired his revolver. It is quite possible that he did not overhear the talk between the brother and sister with reference to the valentine, for he said nothing about that in his statement. Consequently, when he heard her tell her brother that she was going to tell her father, he understood it to be with reference to the assault that he had made upon her. It is, therefore, apparent that, unless at that time he was laboring under such a defect of reason as either not to know the nature or the quality of the act he was doing, or not to know that the act was wrong, the evidence amply sustains the verdict rendered.

The defense interposed was that of insanity. The claim of the defendant's counsel is, in substance, that his father was subject to epileptic seizures; that one of his sisters was weak-minded, and that he himself had been given opium in his infancy, and that the drug had been used by him to some extent up to the time of his becoming twelve years of age, and that he had had a number of epileptic seizures. The evidence upon this branch of the case was chiefly by his relatives, and was sharply controverted also by his relatives. The medical experts also clashed upon the subject. The defendant's expert, Dr. Putnam, reached the conclusion that at the time of the shooting the defendant was in an epileptoid state, the psychic equivalent of epilepsy or double consciousness; that persons in that state act automatically; they go about, eat, buy a railroad ticket, go from one town to another, and when they emerge from that condition they have no recollection of what

had occurred or where they are.    While in that condition
they have no motive nor normal consciousness of the things
they may do or the acts they may commit, and consequently
they are irresponsible and are unable to know the nature or
quality of their acts or that they were wrong.   Dr. Putnam
also appears to have reached the conclusion that the defendant
continued in this state for several days, and that he was in
that state at the time he made his statement to the chief of
police.   Dr. Krauss, the People's expert, reached the conclu-
sion that the defendant was responsible, and that he did know
the nature and quality of his act and knew that it was wrong;
that the statement made to the chief of police two days after
the homicide indicated that he had a very clear recollection of
what had taken place.   The jury, by its verdict, evidently be-
lieved Dr. Krauss instead of Dr. Putnam.   The question of
the defendant's mental responsibility was a question of fact for
the jurors, and we have no fault to find with the conclusion
which they have reached.

Our attention has been called to a number of exceptions
that were taken by the defendant upon the trial.   We have
examined them all with care, but shall here discuss only those
which we regard as most material.   Upon the examination of
Dr. Putnam, the defendant's counsel sought to show by him the
statements that were made by the defendant at the time that
he examined him, which was long after the alleged homi-
cide, for the purpose of determining whether or not he
was insane.   He had testified that he had a talk with the
defendant about the conversations he had with the chief of
police immediately following the shooting, and was then asked
the question: "Did he tell you whether or not he had any
remembrance of them?"   This he answered in the affirmative,
and was then asked the question: "What did he tell you?"   To
this the district attorney interposed an objection upon the

ground that the defendant's own statements in his own behalf were not competent even as a basis of expert testimony, and the objection was sustained. In another place the declarations of the defendant were fully given, and, therefore, the exclusion of them here may not be material, but we have concluded to examine the question. It will be observed that they pertain to what he had stated with reference to his recollection after the shooting had occurred, not before. In the case of *People v. Hawkins,* 109 N. Y. 408, 410, DANFORTH, J., in delivering the opinion of the court, says: "The prisoner's declaration in November as to his condition in September was not competent as evidence of his actual condition at that time, nor could it be the basis of a scientific opinion as to whether he was sane or insane at that period. Had the question related to his condition at the time of the interview, the result might be quite different. Everything said or done at a given period serves to disclose the mental state of the actor, but his narration as to what he said or did, or of his feelings or bodily ailments upon a former occasion, furnishes no foundation for an opinion as to his actual state or condition at that time. It is of no higher grade than the declarations of third persons as to a past transaction, and in like manner is inadmissible." In the case of *People v. Strait,* 148 N. Y. 566, 12 N. Y. Crim. Rep. 479, we had occasion to examine the subject again and the authorities thereon, both in this and in other States, and we there reached the conclusion that a physician may acquire facts from his own observations in the examination of a person, and that there was much in the action, conduct and appearance of a person that aids the physician in forming a conclusion as to his sanity. The facts so acquired the physician may himself give in evidence, at least so far as they can be described; but an expert witness cannot be permitted to give an opinion as to the mental condition of a person at the time of the commission of

a criminal act, based upon a statement not in evidence, made by a party in his own behalf after the commission of the act, which pertains to his past conduct. See, also, *People v. Furlong,* 187 N. Y. 198, 20 N. Y. Crim. Rep. 485. It would thus seem to appear that the declarations of the defendant made to the physician as to his recollections of transactions after the alleged homicide, but long before the time of the interview with the physician, were not competent.

The district attorney, on the rebuttal, had sworn a witness who gave an account of transactions and interviews had with the defendant, and then he was asked to state how his acts, conversations and conduct, which he had described, impressed him at the time, whether rational or irrational. The defendant's counsel objected to the competency of the question as immaterial and irrelevant; that it was not shown that the statement impressed him at all at the time. The court overruled the objections and permitted the witness to answer, but remarked: "I think the better form of question would be to ask him to characterize the acts and conversations as rational or irrational, or else show that they did not form an impression on his mind at the time as being rational or irrational." Thereafter, and upon the examination of the next witness upon the subject, the district attorney followed the suggestion of the court, asking the witness: "Will you characterize the acts, conduct and conversations which you had and which you have testified to, as to whether they were rational or irrational?" This was objected to upon the ground that it did not appear that he formed any impression at the time. The objection was overruled and the witness answered, "Rational."

The question put to the first witness, based upon the statements and acts sworn to by him, and then calling upon him to state how such statements and acts impressed him at the time, whether rational or irrational, is in the form sanctioned

by the authorities. See *People v. Pekarz,* 185 N. Y. 470-481, and authorities cited. It would have been entirely proper for the district attorney to have put a further preliminary question, asking him if he did form an impression at the time. But the witness could not have answered the question put; unless he had so formed an impression, and it would have been his duty to so state. The fact that he did answer the question, in which he stated that the statements and acts impressed him as rational, in an answer to the preliminary question suggested, as well as to the question asked. As to the question put to the second witness, we think the jury was not misled; that the question necessarily involved the impression of the witness, and the permitting of it to be answered in that form was not such error as to require a reversal of the judgment.

The defendant was examined by Dr. Krauss, the expert for the People. Before making the examination, the doctor told him that he had been requested by the district attorney to make an examination of him and to ask him questions regarding himself and the accident. He then asked him to be free and frank with him, stating that he would use him right, and that he need not tell him anything that would incriminate himself as far as the deed was concerned. The defendant's counsel objected to the witness testifying as to any statement made by the defendant, upon the ground that the witness had promised the prisoner that he would treat him all right. It is now claimed that this was an offer by which the defendant was induced to make statements to him, upon the understanding that he would not testify against him. Our conclusion with reference thereto is that such is not the fair or reasonable interpretation of the statement. There was no disclosure of the details of the homicide called out by the doctor nor given by the defendant which was all in controversy. The doctor's examination of him, so far as questions were concerned,

pertained to his memory, history, his family relations, diseases, and the extent to which he had indulged in drinking intoxicants. He then subjected him to a physical examination for the purpose of determining, so far as possible, the presence of any disease. We find nothing in this upon which error can be predicated. The other rulings objected to, we think, were proper.

The judgment and conviction should be affirmed.

CULLEN, Ch. J., EDWARD T. BRACKETT, VANN, WERNER, WILLARD BARTLETT and HISCOCK, JJ., concur.

Judgment of conviction affirmed.