THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LILLIAN S. RAIZEN, Appellant.

Second Department, January 29, 1925.

Crimes — murder, second degree — conduct of trial — criticism by trial judge of jurors who, on examination, refuted affidavits made by them that they did not have scruples against capital punishment and had not formed opinions, was not prejudicial to defendant's rights — jury properly found that defendant was not insane at time crime was committed — evidence — expert evidence — no error to exclude from testimony by expert for defendant statements made by defendant to him concerning her actions prior to commission of crime — no error to exclude evidence that experts engaged by former district attorney were not called — failure of district attorney to call said experts was not taken advantage of by defendant on trial — no error to exclude what was read by Christian Science healer to defendant while defendant was taking treatments.

In the prosecution for murder in the first degree, resulting in a conviction of murder in the second degree, it is not prejudicial error for the trial court on the examination of certain jurors after they had been sworn and testified that they were prejudiced against capital punishment and had formed an opinion as to the guilt or innocence of the defendant which they thought would not permit them to give a proper consideration to the case, to refer to the affidavits made by the jurors before the commissioner of jurors in which the jurors had sworn to the contrary and to tell said jurors to stay in the court room until the judge could consider the question of their perjury

The evidence concerning the plaintiff's sanity justified the jury in finding that she was not insane at the time the crime was committed, and in fact the testimony by the defendant, coupled with her confession which she freely made in the presence of and on the advice of her counsel and her father within a few hours after the shooting, is a complete contradiction of the testimony of the medical experts that she was insane at the time the crime was committed.

The claim by the defendant that her rights were prejudiced by the action of the trial court in eliminating the testimony of one of her experts is refuted by her contention that the testimony actually given by her experts conclusively establishes that she was insane at the time the crime was committed.

It was not error for the court to exclude from the testimony by one of defendant's expert witnesses, statements made by the defendant to the witness after the commission of the crime as to her actions prior to the time of the homicide.

It was not error for the court to exclude evidence tending to show that a former district attorney had engaged expert witnesses to examine the defendant, and that they were not called by the district attorney who had charge of the prosecution, for the present district attorney had the right to use or not to use those witnesses, in his discretion. Furthermore, the most that the defendant could hope to obtain through the failure of the district attorney to call those witnesses was an inference as an arguable circumstance for the jury to take into consideration that the witnesses would, if called upon to testify for the People, have given evidence against the People's case, but the defendant could not take advantage of that on appeal since she did not insist that the witnesses be called or that they be compelled to testify, nor did she ask the court to charge on the failure of the district attorney to call the witnesses.

It was not error for the court to exclude the testimony of a Christian Science healer called on defendant's behalf as to what she had read to the defendant from a Christian Science manual during the time that the defendant was taking treatments.

KAPPER, J., dissents, with opinion.

APPEAL by the defendant, Lillian S. Raizen, from a judgment of the Supreme Court, Kings county, rendered on the 18th day of February, 1923, convicting her of the crime of murder in the second degree, and also from an order dated the 27th day of February, 1923, denying her motion to set aside the verdict and for a new trial made upon the minutes.

Upon conviction defendant was sentenced to be confined in the State Prison at Auburn for an indeterminate period of not less than twenty years nor more than the term of her natural life.

*Benjamin Reass* [*Hugo Hirsh* and *Emanuel Newman* with him on the brief], for the appellant.

*Henry J. Walsh, Assistant District Attorney* [*Charles J. Dodd, District Attorney*, with him on the brief], for the respondent.

MANNING, J.:

The charge upon which the defendant was convicted was that on December 10, 1921, she " wilfully, feloniously and of malice aforethought, shot and killed Abraham Glickstein." Glickstein was a physician, about forty-three years old, a married man and father

of a family. The shooting took place on December 10, 1921, between five and five-thirty P. M. at the doctor's office No. 535 Bedford avenue, Brooklyn. The bullet entered his chest, penetrated his heart and death was almost instantaneous. The defendant on the day before the tragedy had returned from a trip to Florida, to which place she claimed she had gone for the benefit of her health. On the afternoon of the shooting, and about the time mentioned, the defendant entered the reception room of the doctor's office and there waited with some other patients until she was admitted to his consultation room where the actual shooting took place. Glickstein opened the door between the reception room and the consultation room and spoke to the woman, asking her to walk in. She said that she preferred to wait until the other patients who were present had been attended to. Shortly thereafter she went into the consultation room carrying in her hand a muff or fur piece in which was concealed the revolver with which she committed the deed. In a few seconds after she had entered the room the door was thrown open and the doctor appeared and fell to the floor bleeding from the nose and mouth, and in a few moments he expired. The revolver with which the crime was committed was found on the floor of the doctor's office wrapped up in the so-called muff or fur piece. The defendant in the excitement of the moment made her escape from the scene of the shooting, and disappeared. After a few days, however, on the advice of her counsel, she surrendered to the police authorities and made a full and complete confession of the affair to the district attorney. Four lawyers, including one who appears for her on this appeal, and her father were present when this confession was made. The revolver with which the shooting was done had been purchased by the defendant on the 2d day of December, 1921, before she left Florida for New York, and there is no dispute that prior to the actual buying of the revolver she had written a letter to the firm from whom it was purchased stating that she desired to procure a revolver with a noiseless attachment. This is all that need be stated as to the actual commission of the crime by the defendant. The killing was admitted and the circumstances surrounding the shooting are not disputed here nor were they upon the trial.

At the time she killed Glickstein the defendant was twenty-nine years old; her mother was dead; her father was living; her maiden name was Schaefer; but on the 8th day of May, 1921, that is, the May preceding the tragedy, she was married to a man named Charles S. Raizen. It is undisputed, by the testimony of the defendant herself and by other witnesses in the case, that the defendant and her victim had maintained meretricious relations for

four or five years before she killed him. These relations started when she was between twenty-two and twenty-five years of age. Her claim was that the relations began involuntarily on her part and that in the first instance the doctor had assaulted her while he was treating her as a patient. Nevertheless, she continued to visit the doctor afterwards and had sexual intercourse with him on numerous occasions. Her story was that just prior to her marriage these relations were broken off, but she stated upon the trial that shortly before she was married the doctor again tried to prevail upon her to resume their relations, but that she success-fully escaped from him. She also claimed that Glickstein had performed an operation on her while these relations continued, the effect of such operation being to make her sterile. Her claim was that all of the ill-treatment to which she had been subjected by the doctor resulted in the unbalancing of her mind; and her defense on the trial was that her mental condition was such that she did not know what she was doing when she killed him and that she did not know it was wrong.

The prosecution contended on the trial and contends on this appeal that the homicide was committed with premeditation, deliberation and intent, and that the claim of insanity and mental disorder, and the so-called unbalancing of the defendant's mind was part and parcel of an ingenious and well-prepared plan to kill the doctor, trusting to her carefully and skillfully timed and widely circulated so-called delusions and obsessions to escape the con-sequences of her act. And the People further claim that the evidence adduced on the trial fully sustained this charge.

The defendant contends that the People failed to establish its case against her beyond a reasonable doubt; that the verdict is against the weight of credible evidence; that prejudicial rulings and errors were made by the trial court, and that having, as they claim, proved the defense of legal insanity, the verdict arrived at by the jury can only be accounted for on the theory of these prejudicial rulings and the unfavorable attitude of the trial court towards the defendant. The judgment of conviction is challenged by the appellant here on six specific grounds: *First.* That the State has not only failed to establish the sanity of this defendant beyond a reasonable doubt, but, on the contrary, the legal insanity of the defendant was convincingly proved by an overwhelming preponderance of the credible testimony. *Second.* That the court erroneously excluded evidence tending to show that three well-known alienists examined the defendant at the request of the district attorney very shortly after the commission of the homicide, and
29

reported to the district attorney after such examination that she was legally insane. *Third.* That the court erroneously excluded declarations and statements made by defendant during her examination by the experts and others shortly after the commission of the crime. *Fourth.* That the trial court was not vested with authority or discretion arbitrarily to exclude competent prospective jurors; that the court's attitude toward talesmen while they were being examined was of such a character as to bring about an intimidation of the jury and calculated to suppress their real views and opinions. *Fifth.* That the trial justice was guilty of improper conduct which invoked hostility to and seriously tended to prejudice the defendant's cause in the minds of the jury; that the trial justice so acted as to excite prejudice and distrust in the minds of the jury against the defendant and her witnesses. *Sixth.* That the court erred in excluding certain testimony in the nature of some quotations from a book which had been read to the defendant by a Christian Science healer while the defendant was under treatment by such healer.

Taking up these objections along the lines of orderly procedure, and concerning the point made that the attitude of the trial judge towards the talesmen while they were being examined was of such a character as to bring about an intimidation of the jury and calculated to suppress their real views and opinions, the effect of the court's act being as counsel claims "to prevent an honest expression of their sympathies, sentiments and convictions, so as to deprive the defendant of a fair knowledge of the views of the talesmen on matters pertinent to the inquiry, and of facts upon which the defendant could determine whether to accept or reject the juror." It appears that there is no justification for this charge against or reflection upon the learned justice who presided at the trial. The record discloses that at the opening of the trial the first talesman was called and sworn. The district attorney asked him if he had any scruples against capital punishment, and whether they were restricted to men or women. The witness replied that he had, and that it applied to every one. The court then examined the talesman, and asked him how long he had the scruples, and the witness answered: "Ten or fifteen years at least." The court asked: "There has never been any period of time when you have been without them?" The talesman answered: "No." The judge then showed him an affidavit in which he had sworn that he had no conscientious scruples against capital punishment. The talesman asked to examine the affidavit, and the court said: "Why did you make that affidavit? It says that you have no scruples against capital punishment." The talesman answered: "I didn't know

that I made an affidavit saying I had no scruples." The judge said: " You stay here. I will consider your question of perjury later. Remain in the court room. Do not leave the court room, sir." The court then excused the talesman. The next talesman said that he had conscientious scruples, and that he had entertained them for some time. The court showed him an affidavit that he had sworn to, and the talesman admitted that he had signed it. The court excused him and told him to remain in the court room, saying: " I will consider your question later." The next talesman desired to be excused, for he said that he knew one of the defendant's counsel, and that his acquaintance with him might affect his judgment on the case. The court directed this talesman to step out of the box and not to leave the court room. The next talesman said that he had read the newspapers and had formed an opinion and that the opinion might stand in the way of his giving proper consideration to the case. This talesman also had signed an affidavit, but said that he did not remember doing so. The court showed him the affidavit, saying: " That says that you have no doubt of your ability to lay aside any opinion that you might form from reading newspapers or from any other source in connection with this matter. Now, you say that you cannot do that? " The talesman made no answer. The court then asked: " Do you want to examine this juror, Mr. Conway? Mr. Conway: No, sir." The court directed this talesman to step aside. Another talesman was called and said that he had formed an opinion. Counsel for the defendant said that he desired to ask no questions of the talesman and after some discussion the court directed the talesman to remain in the court room, saying: " We cannot have jurors swearing to these things when they get on the panel and then swearing differently when they come into court."

Of course, it is perfectly plain that at this time the defendant had not exhausted her challenges to which she was entitled under the law, nor did the defendant's counsel make any protest or unfavorable comment upon the action of the trial judge. The record shows that the jury which finally heard the case was then impaneled without any unnecessary delay or interruption of the proceedings and the trial proceeded.

This is the incident complained of in its entirety, and what there is in the conduct of the trial judge to complain of, so far as this episode is concerned, I cannot see, and hence I consider that the insinuations and remarks of the counsel for the defendant in connection with this jury incident are entirely unwarranted. The jury was a special one, known as a " blue-ribbon " panel; every one of those summoned had qualified for duty before the commissioner

of jurors, and in doing so had signed affidavits in regard to their qualifications, and service on such a jury excused them from ordinary jury duty. The learned justice was clearly within his rights when he commented on the conduct of these talesmen and admonished them, and certainly his discretionary act in this respect cannot be said to be prejudicial to the defendant. None of her rights were invaded, and what the trial justice did in the situation disclosed is almost of daily occurrence in our trial courts.

Having reference to the claim of the appellant that the State not only failed to establish the sanity of the defendant beyond a reasonable doubt, all that can be said on this branch of the case is that the question of the guilt or innocence of the defendant was clearly one of fact for the jury to determine. There is no claim on the part of the defendant that this important question was not properly presented to the jury, and the jury found against her. The trial of the case took six days. Some thirty-five witnesses testified for the defendant and eighteen witnesses testified for the prosecution. The printed record on appeal here consists of 1,000 pages, and an examination of what took place upon the trial will, I think, conclusively show that the defendant was given every opportunity to present her defense before a jury of her own selection; and we have a situation where the triers of the facts heard all of the evidence on both sides, and after giving such evidence the due consideration to which it was entitled settled the questions of fact adversely to the appellant.

The case of the People was presented in a comparatively short time. They presented their direct case, which, of course, under the circumstances, was all that they were obliged to do, as on the part of the defendant it was not disputed that she had shot and killed Glickstein. All that the People were required to do was to prove the appellant's guilt beyond a reasonable doubt, and they were also required to prove her sanity beyond a reasonable doubt, and her sanity like every other question in the case was one of fact for the jury. The weighing and consideration of the evidence is the jury's peculiar province, and it is almost elementary that an appellate court cannot disturb its finding where the issues were properly submitted to it as in this case, and particularly in a charge of the court to which no exception was taken.

The defense, as I have said, was that at the time of the commission of the crime the defendant was so insane that she did not know the nature and quality of her act, nor did she know that it was wrong. Her counsel before us argues that under the facts established on the part of the defendant this defense was testified to " by alienists of recognized qualifications and of pre-eminent

ability as specialists in mental disorders, and, in addition, literally by a host of lay witnesses," and "that the testimony of these lay witnesses, together with the testimony of the alienists established with a certainty and conclusiveness rarely met with, the legal insanity of the defendant." The plain fact, however, is that the jury whose sole province it was to decide the question of the defendant's sanity and responsibility evidently did not accept the evidence of the medical experts, nor the so-called host of lay witnesses who testified in the defendant's favor. This fact is conclusively shown by the jury's verdict, and hence if the triers of the facts who saw these various witnesses discredited them, what are we who do not have that privilege to do under the circumstances? Certainly we should not disturb the jury's finding unless we arrive at the conclusion that injustice has been done to the defendant. However, as I read this record no such situation is presented here. So far as the testimony of the lay witnesses is concerned a careful examination of the record will disclose that it is just the kind of evidence that might be expected from witnesses of this character, many of whom had only a passing acquaintance with the defendant and who evidently volunteered to aid her in the unfortunate situation in which she found herself. Some of them said they would not regard her as insane at all; some that she was peculiar and temperamental; others said she was hysterical, and several testified that she was given to weeping and crying and the shedding of tears. Her employer for whom she had worked as a bookkeeper for eight years said that she was a very efficient clerk. She had crying spells and was high-strung. At first he testified that he considered her acts irrational, but later made the statement that he regarded her as an efficient clerk. He also said that he had advanced her salary right along. One of these lay witnesses said that the reason the defendant was considered irrational was that she wore old clothing. The Christian Scientist who testified on the part of the defendant and from whom the defendant had received treatment said that the defendant was hysterical and irrational, and yet this same witness swore that during all the time that she had had dealings with the defendant the latter was clearly able to think for herself and to think connectedly and coherently, and in relating details did so minutely. She was of average intelligence. Another of her witnesses thought the defendant was well educated, but that she was not " right " because she wore poor and ill-fitting clothing. The foregoing may be taken as a sample of the testimony of the lay witnesses. In addition thereto we have the testimony of several acquaintances she had made on her trip going to and returning from Florida by boat. Several of these persons testified

Second Department, January, 1925.                    [Vol. 211

by means of depositions and they gave instances of various
peculiarities which they observed in connection with the defendant.
Some of these persons said that although they were absolute
strangers to the defendant, she disclosed to them the story of her
relations with the man whom she subsequently shot and killed.
It would serve no useful purpose further to reproduce the testimony
of these lay witnesses, most of which is of a similar character.
In my judgment the proof in this respect is rather weak and uncon-
vincing to such an extent that the jury were entirely warranted
in disregarding it, as they evidently did.

The defendant testified in her own behalf. On the direct exam-
ination she was examined by her counsel, who, by the way, was a
very skilled criminal advocate, and he traced her career from the
time that she was a very small child up to the day of the tragedy.
From a reading of her testimony given upon the trial it is evident
from the manner in which the defendant testified that both her
counsel and the trial judge had considerable difficulty in getting
her to talk loud enough so that the jury could hear her. At times
during the examination she interrupted and halted the trial com-
pletely by refusing to answer, also by becoming seemingly hysterical,
emotional, and if I may use the word, rather theatrical, especially
when some telling points in the evidence were made against her.
Nevertheless, she told in detail the circumstances of her early life
and of her meeting with Glickstein the first time she ever called
at his office for treatment. The examination proceeded in great
detail, and without the slightest evidence of any lapse in memory
at all on the part of the defendant she gave dates, incidents and
facts without any difficulty; she even related the particular con-
versation and the words used by the doctor and herself when he
saw her, and she also described many of his acts. She talked intelli-
gently about her Christian Science experience, stated the number
of pounds of flesh she had lost, and told in detail the preparations
that were made for her marriage. She testified fully as to her
feelings and sentiments and described her trip to and from Florida.
During this recital her counsel again told her that she would have
to speak louder as he could not hear her, and the court remarked,
" You will have to talk louder if you want the jury to hear you.
Otherwise, there is no use talking at all." This admonition had
to be repeated several times. Again the court was obliged to say
to her: " If you want the jury to hear your story, you had better
talk to them, instead of whining about it. Mr. Conway [her
counsel]: May I have the last answer read? The Court: No,
sir; there is no occasion for it. The witness is able to talk, and
does talk, at times, in a pretty strong voice. So there is no

occasion for it. If she does not wish to do it, we cannot make her." The examination proceeded again, the witness telling of her wanderings when she came back at the time of the homicide. Her counsel evidently had considerable trouble in trying to get the witness to go on, and he said at the conclusion of an inquiry: " Do you recall, Mrs. Raizen, please? " The court interjected: " Go right on, Mr. Conway. Mr. Conway: I am trying to, but I cannot do any more than ask the questions. The Court: She refuses to answer that one. Ask another. Mr. Conway: I except to your Honor's statement that she refused to. I did not hear any refusal. The Court: Yes, there is an apparent refusal. She has not answered. If you have another question, put it. Mr. Conway: At any rate, I haven't got the answer. I admit that." Her counsel then asked her this question: " Do you remember being down to the district attorney's office on the Tuesday or Wednesday of the following week? A. (No answer.) Q. Do you remember being examined by anybody there, or talking with anybody there? A. (No answer.) Q. Do you or did you, at the time when you were in the Doctor's office, realize or understand the nature and quality of the act which you were doing? A. (No answer.) Mr. Conway: Now, I would like to have an answer to these questions. The Court: Your lawyer wants you to answer. Why don't you do it? The Witness: I didn't hear. The Court: Oh, yes, you did. Mr. Conway: May I take an exception to that remark of your Honor? The Court: Certainly, of course. Now answer. The Witness: I didn't hear them. Mr. Conway: Now she says she didn't hear those questions. May I repeat them? The Court: No, I don't think so. You can ask the last one." At this point there was a further discussion between the court, counsel for the defendant and the district attorney concerning a question framed by the defendant's counsel, the question being as follows: " Q. Did you, at that time in the doctor's office on that evening, realize the nature and quality of the act which you had done or were doing? " The court said: " Perhaps she will say she did something. I will allow it. She has not said so yet. Q. [By Mr. Conway] Did you know that the act which you did there was wrong? Mr. Conway: May I have it noted on the record that the witness shakes her head negatively? The Court: No; we don't take shakes on the record. Q. Will you say yes or no to that question, please? A. [By the Witness] No." She was then questioned by the court, and this is the particular incident referred to by the defendant's counsel in his brief wherein he claims that the court prejudiced the defendant's rights by asking questions. " Q. What act didn't you know was wrong? What act did you do that you didn't know was

wrong? A. (No answer.) Q. Answer, please. A. (No answer.) Q. Well, what is it? I didn't hear your answer. What is it? A. I didn't know that — Q. Go on. What is it? A. I didn't know I had a weapon in my hand, and I heard — Q. Now, answer, please. A. I didn't know that I had a weapon in my hand. Q. You told Mr. Conway you took your gun with you, when you went out of the hotel. Why do you say you didn't know you had it with you? A. I hardly recall taking it with me. Q. Well, what did you do that you didn't know was wrong? That is the question I asked you, because you told your lawyer that the thing you did, you didn't know was wrong. Mr. Conway: I think my question was, what acts. By the Court: Q. What did you do? What was the thing or things you did, that you didn't know were wrong? A. I heard the report of a cartridge. Q. Now, answer, please. A. Going there and reporting a cartridge. Q. Go on and tell us what the things were, or the thing was, whichever it is, that you didn't know was wrong, which you did. A. Going there and reporting a cartridge. * * * Q. What else? A. I don't know anything else. Q. Going there and reporting a cartridge? Is that what you meant when you answered your lawyer that the thing or things you did, you didn't know were wrong? A. Yes. The Court: That is what you meant? All right. Mr. Conway: I think that is all."

When the cross-examination began the same difficulty was experienced in obtaining answers from the defendant. " Q. [By Mr. Gallagher to the defendant] Now, if you keep your voice up, please, we will be through with this in shorter time. Do you remember going to the district attorney's office on the night of December thirteenth? The Court: You had better answer a little more promptly. You will get through so much sooner. A. Yes, sir. Q. You didn't cry that night at all, did you? A. I don't remember." The district attorney then asked her concerning the visits of Dr. Meagher to her in the Raymond Street Jail. The witness said she could not remember how many times the doctor had been there, or whether she cried or had trouble with her eyes. Here the court interjected: " Q. Well, you are not crying now, are you? Are you crying now? A. Yes, sir. Q. That is what you call crying, is it? No tears, are there? A. Yes, there are tears. [By the District Attorney]. Q. Now, Mrs. Raizen, do you desire to shorten this examination? A. No, Mr. Gallagher; I will do whatever you say. Q. All right; stop this action, if you can, and let us get right along. Will you do that? A. I will try, yes, sir."

I think it is apparent from such excerpts as I have given from the testimony of the defendant here that both the court and counsel

were having great difficulty with the defendant in endeavoring to have her answer the various questions in a voice loud enough for the jury to hear her. Counsel for the defense here complains of the attitude of the trial court toward his client as being unfavorable; but as I study the picture presented by this record I confess I do not see any justification for the charge. I think a reading of her testimony both on the direct and cross-examination will establish the fact that she was a shrewd, cunning and well-informed witness who had a remarkable memory of the past events of her life and that she became hysterical, emotional and had resort to tears only when at certain stages of the examination she was pressed very closely as to circumstances in the case which to her mind presented an unfavorable aspect so far as she was concerned.

Another instance may be given where the defendant created a scene in the court room. She was asked upon cross-examination: " Q. Did you ever try to purchase or to get anything that would deaden the sound, a silencer? A. I don't know anything about — I don't — no, I didn't. Q. Did you ever make any inquiry as to whether you could get such a thing as a silencer? A. Whether I could get a silencer? Q. For a revolver? A. Or what? Or a revolver? By the Court: Q. For a revolver? A. Oh, a silencer for a revolver? No." When confronted, however, with a letter which she had written to the firm from which she purchased the revolver, inquiring the price " of a 32 x 38 calibre revolver with noiseless attachment," she admitted that the letter was written by her, but gave utterance to such remarks as, " Oh, spare me; Spare me; " and stopped the proceedings for a while. On the redirect examination by her counsel after this episode of the trial, the record shows that the witness again wept and that considerable difficulty was experienced in getting her story. At no time during the examination of the witness did it appear that she was at all deficient in her mental make-up and in no instance did she display any of the symptoms of insanity with which her medical witnesses swore she was afflicted, and I take it that the jury were fully convinced that the woman was not insane although one of her medical experts swore that she was insane long prior to the commission of the crime, at the time of the commission of the crime and that she was actually insane at the time of the trial. Her testimony given upon the trial, coupled with her confession which she freely made within a few hours after the shooting (a confession freely and voluntarily made by her) in the presence of her counsel and her father, was in my opinion a complete contradiction of the medical experts' statements that the woman was insane. Four physicians — alienists — testified to the appellant's insanity at the

time of the commission of the crime. They were Dr. Kirby, Dr. Pilgrim, Dr. Harris and Dr. Hicks. Two medical experts testified on the part of the People, Dr. Meagher and Dr. Senior, and of course there followed, as is usually the case, contradiction and conflict between the doctors. The experts who appeared for the prosecution contended that the woman was sane and responsible for her acts; while the experts for the defense contended that she was insane and not responsible for her acts. Dr. Kirby, the chief medical expert for the defendant, had examined the defendant on eight separate occasions between December 15, 1921, and January 31, 1923. The other experts for the defense were present at some of these examinations. The experts on the part of the People — Dr. Meagher and Dr. Senior — examined the defendant pursuant to an order of the County Court. Dr. Meagher testified that he had examined the defendant nineteen times. The testimony of Dr. Meagher and Dr. Senior was to the effect that when the appellant shot the deceased on December 10, 1921, she was sane. Dr. Meagher further testified that the symptoms displayed by the appellant were those of feigned insanity. Dr. Senior, the People's expert, summed up his testimony by saying that in his opinion the appellant fully appreciated the nature and quality of the homicide and that she never was insane. The case shows that while the medical experts for the defense were on the stand a hypothetical question giving the entire history of the case was propounded, in the first instance, to Dr. Kirby, and the question closed as follows: " Now, assuming the truth of those facts, Doctor, what in your opinion was the mental condition of the person described therein as this ' young woman ' at the time of the homicide on December 10th, 1921? " The doctor said she was insane, and also gave his opinion that at the time of the shooting the defendant knew the nature and quality of her act but that she did not know it was wrong. Drs. Hicks, Pilgrim and Harris gave testimony of a similar nature. Although the appellant's counsel upon this appeal contends that the court committed error in limiting the testimony of Dr. Kirby to some extent, yet the fact is that the counsel for the defendant was of the opinion that the medical testimony given by his experts was in point of fact conclusive, and if this be so then his charge that the court limited the examination and in doing so prejudiced the rights of his client would not seem to be sustained. One of the points urged by counsel for the defendant here is that the trial court committed error in excluding the testimony of Dr. Kirby as to conversations with the appellant subsequent to the homicide, and the case of *People v. Nino* (149 N. Y. 317) is cited as an authority. The *Nino* case.

has been distinguished and questioned in several cases since decided by the Court of Appeals, namely, *People* v. *Youngs* (151 N. Y. 210); *People* v. *Egnor* (175 id. 419); *People.* v. *Faber* (199 id. 256). In *People* v. *Youngs* (*supra*) the court said: " The testimony of experts is an exception to the general rule which requires that the witness must state facts and not express opinions. In such cases the opinion of the witness may be based upon facts so exclusively within the domain of scientific or professional knowledge that their significance or force cannot be perceived by the jury, and it is because the facts are of such a character that they cannot be weighed or understood by the jury that the witness is permitted to give an opinion as to what they do or do not indicate. In such cases it is the opinion of the witness that is supposed to possess peculiar value for the information of the jury. Of course, all the facts or symptoms upon which the opinion is based may be drawn out also, either upon the direct or cross-examinations. It is undoubtedly the better practice to require the witness to state the circumstances of his examination and the facts, symptoms or indications upon which his conclusion is based before giving the opinion to the jury. * * * We think that when it is shown that a medical expert has made the proper professional examination of the patient in order to ascertain the existence of some physical or mental disease he is then qualified to express an opinion on the subject, though he may not yet have stated the scientific facts or external symptoms upon which it is based." (Citing *People* v. *Kemmler*, 119 N. Y. 580; *People* v. *Taylor*, 138 id. 398; *People* v. *Hoch*, 150 id. 291.) The circumstances surrounding the incident complained of in the present case would seem to be governed by the proposition involved in *People* v. *Hill* (195 N. Y. 16) and in *People* v. *Furlong* (187 id. 198). In *People* v. *Hill* (*supra*) the defense sought to prove certain statements made by the defendant to an alienist, called by him as a witness, long after the commission of the homicide. But the trial court excluded them. The Court of Appeals in passing upon the ruling of the trial court there said: " In the case of *People* v. *Hawkins* (109 N. Y. 408, 410), DANFORTH, J., in delivering the opinion of the court says: ' The prisoner's declaration in November as to his condition in September was not competent as evidence of his actual condition at that time, nor could it be the basis of a scientific opinion as to whether he was sane or insane at that period. Had the question related to his condition at the time of the interview, the result might be quite different. Everything said or done at a given period serves to disclose the mental state of the actor, but his narration as to what he said or did, or of his feelings or bodily ailments upon a former

occasion, furnishes no foundation for an opinion as to his actual state or condition at that time. It is of no higher grade than the declarations of third persons as to a past transaction, and in like manner is inadmissible.' In the case of *People* v. *Strait* (148 N. Y. 566) we had occasion to examine the subject again and the authorities thereon, both in this and in other States, and we there reached the conclusion that a physician may acquire facts from his own observations in the examination of a person, and that there was much in the action, conduct and appearance of a person that aids the physician in forming a conclusion as to his sanity. The facts so acquired the physician may himself give in evidence, at least so far as they can be described; but an expert witness cannot be permitted to give an opinion as to the mental condition of a person at the time of the commission of a criminal act, based upon a statement not in evidence, made by a party in his own behalf after the commission of the act, which pertains to his past conduct. (See, also, *People* v. *Furlong*, 187 N. Y. 198.) It would thus seem to appear that the declarations of the defendant made to the physician as to his recollections of transactions after the alleged homicide, but long before the time of the interview with the physician, were not competent." It is the contention of the People that the reasoning just referred to is sound and appropriate. They claim that such statements of the defendant are self-serving and hearsay, and that a defendant on trial might concoct any sort of a defense and with his statements out of court bolster up such a defense to suit himself and thereby defeat the ends of justice. I am free to say that I think the claim of the People is well founded. The issue presented on the trial was not whether the defendant here was insane at the time of her examination by the expert or at the time of the trial, but whether she was insane when she committed the homicide. Of course, if she was insane at the time of the trial, under the law she could not have been placed on trial at all. (See Penal Law, § 1120; Code Crim. Proc. § 836.) It clearly appears from the record that defendant's medical experts could say no more than they did say. So far as the record shows the defendant had the full benefit of Dr. Kirby's medical testimony, and even if he had been allowed to testify as to the defendant's statements to him, which were excluded by the court, she would have been in no better position than she was when he gave as his final judgment the answer that she was insane. The record shows conclusively that Dr. Kirby examined the defendant on many occasions and that he talked with her on many subjects. Counsel for the defendant in his brief says: " Four alienists, three of whom were men who had made a life study of insanity and were universally

recognized as experts by the medical profession had testified that the defendant was insane and that they had come to this conclusion as a result of their physical and mental examination of the defendant. This conclusion was their diagnoses irrespective of a similar opinion expressed by them based upon a hypothesis. It should be clearly borne in mind that their conclusions were not merely based upon an assumption of facts, but upon observation and examination of the defendant for the express purpose of determining the ultimate fact — the defendant's insanity."

Another point is made by the appellant wherein it is claimed that the court committed error when it excluded the evidence tending to show the employment by the district attorney of alienists to examine the appellant. In connection with this point counsel for the appellant here practically charges the district attorney with suppressing evidence which counsel says it was the district attorney's duty to produce. There is no merit in the point, and the circumstances in connection therewith do not justify the assertions made in reference thereto. It seems that a prior district attorney (not the one who was in office when this case was tried) had retained certain alienists to examine the defendant. Upon the trial the present district attorney did not care to avail himself of the services of these medical men, and in this I take it the district attorney, as representing the People, was clearly within his rights. Conceding for the moment that there is any force in the argument of the appellant under this particular point, the most that the appellant could look for from the conduct of the district attorney in failing to produce a witness or witnesses under the People's control, was an inference as an arguable circumstance for the jury to take into consideration, that the witness would, if called upon to testify for the People, have given evidence against the People's case. The difficulty with the appellant's contention, however, is that the record discloses no act upon the part of the defendant's counsel to insist that the witnesses be called, or that they be compelled to testify. Neither does it appear that the appellant in the court below asked the court to charge that any such presumption weighed against the People. The record is barren of any application by the defendant's counsel for an appropriate instruction that would present any reviewable question to any appellate court. And it further appears from the record that when one of these doctors was called by the defendant's attorney, he refused to give an opinion as to the defendant's mental condition, saying: " I was there as an expert, and I am here as a witness. I am not here to give expert testimony. * * * I decline to give expert testimony, being subpœnaed as a witness." There are many authorities holding

that an expert witness, that is, one possessing unusual skill and knowledge in a science, profession, or other. calling, called upon to express an opinion based on conclusions derived not from personal knowledge of the facts of a given case, but from his ability to draw inferences and conclusions from reported facts, cannot be compelled to testify, in the absence of an agreement to do so for a stipulated compensation. (See *Brown* v. *Travelers' Life & Acc. Ins. Co.*, 26 App. Div. 544; *Birch* v. *Sees*, 178 id. 609; *Matter of Schapiro*, 144 id. 1; *Tiffany* v. *Kellogg Iron Works*, 59 Misc. 113.) Under the evidence disclosed in the record before us in this case the testimony of Dr. Hunt as to his opinion of the appellant's sanity was kept out of the case by the doctor's refusal to give it, and the record is barren of any attempt made on the part of the appellant's counsel to compel the doctor so to testify.

The point made by the appellant that the court committed error in excluding the testimony of the Christian Science witness as to what she had read to the appellant from a Christian Science manual is without merit, and the action of the court in excluding such testimony was not an error. The record here shows that everything that was said by the Christain Science witness to the appellant during the course of her treatment of the appellant, and everything that the appellant said to the witness, was received in evidence by the trial court down to the most minute particular.

The record shows that this trial was a long one, and it may be possible that there were minor errors regarding the admission or exclusion of evidence as the case progressed. The record, as I read it, is barren of any substantial error which in any way prejudiced the defendant's rights. In my opinion she had a fair and impartial trial before a judge of learning and ability, who safeguarded her interests in every way. The prosecution contends that the appellant has had the benefit of a trial in which every guaranty with which the law surrounds a defendant in a criminal case was scrupulously observed by the court, counsel and jury, and that the charge of the trial court was a model, marshaling the facts and expounding the law in language that was clear, simple and unaffected, and a charge which could have left no doubt in the minds of the jury as to the issues to be determined. The district attorney points out that it is rare, indeed, that a criminal case of such importance is allowed to go to the jury without a request for instructions or without exception to the charge, and yet the prose-cution says that that is what happened in this case, and that is a fact in itself which is a tribute of some significance to the fairness and entire impartiality with which the trial was conducted. I am in entire accord with the sentiments thus expressed, and even if

there be any minor errors in this case we are admonished by section 542 of the Code of Criminal Procedure that "After hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties." We have such a record here.

The judgment and order should be affirmed.

RICH, J., concurs; KELLY, P. J., and YOUNG, J., concur for affirmance in separate memoranda; KAPPER, J., dissents and reads for reversal and a new trial.

KELLY, P. J. (concurring):

In my opinion the evidence in this case was ample to sustain the verdict of the jury. There is no dispute that the defendant killed the decedent, that the homicide was deliberate and premeditated. The defense was that defendant was insane at the time she shot decedent, and again that defense is narrowed by the concession that at the time she knew the nature and quality of the act she was doing. This left the issue whether at the time she was laboring under such a defect of reason as not to know that the act was wrong. I think her own evidence of her actions at the time of the homicide is positive proof that she knew that the act was wrong. Her insistence on seeing the deceased alone, her escape by way of the operating room after the shooting, her journey to Manhattan instead of to her home in Brooklyn, her telephone messages, and her subsequent meeting with her father and her husband in the street, the consultation not with medical men but with experienced counsel, and her subsequent surrender two days later by her counsel to the district attorney, all these things are incompatible with the claim that she did not know that she had violated the law. It is impossible to read her statement two days after the killing, made to Judge Lewis, then district attorney, voluntarily, by advice of and in presence of her counsel, who took part in the examination, asking her questions, without the abiding conviction that at the time of the crime she was sane, knew what she was doing and knew that it was wrong. A woman more than twenty-one years of age, engaged in business in Manhattan, maintained illicit relations with deceased, a married man, for four or five years, although she knew and visited his wife and family. She wanted him to go away with her and to marry her in some other State. He refused and she subsequently married her present husband. She testifies that at the outset of their relations deceased assaulted her, but we have only her story as to the inception of the relations, the dead man cannot tell his story, and she voluntarily continued the relations for four or five years. The jury saw her and heard

her story, and their verdict seems to me to be in accord with the evidence. Indeed, they dealt mercifully with her, because the evidence would have justified a verdict of murder in the first degree.

My brother MANNING has discussed the exceptions urged ·as grounds for reversal of the judgment. I concur with his conclusions. I do not think that it was error to exclude the questions asked the alienist as to statements made by defendant to him some time after the shooting concerning her history and acts prior to the killing. There was no claim of present insanity, it was not claimed that she was insane at the date of her interview with the alienist, and he was allowed to testify to everything he observed concerning her then physical and mental condition. Her narrative to him of her transactions prior to the commission of the crime was, it seems to me, hearsay. But all of these alleged transactions were before the jury, testified to by the defendant herself and her witnesses, and were embodied in the hypothetical question propounded to the expert, upon which his opinion was founded, and the jury had the benefit of his opinion. As to the appellant's criticism and exceptions concerning the remarks of the trial justice and the complaint that his manner of conducting the trial was prejudicial to the defendant, I have to say: There were some incidents which I think might better not have occurred, some remarks which I think had better not have been made, but out of it all there can be no doubt on examination of the record that the learned justice intended to be absolutely fair and impartial as between the prosecution and the defendant. His charge to the jury was not objected to or excepted to. He placed the responsibility for the verdict squarely on the jury. In my opinion the defendant's case was not prejudiced by the rulings of the court or the manner of the trial justice. We are directed by the statute (Code Crim. Proc. § 542) to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, and I, therefore, vote to affirm the judgment.

YOUNG, J. (concurring):

I concur for affirmance by virtue of section 542 of the Code of Criminal Procedure, but am of the opinion that the declarations and statements made by defendant during her examination by the experts were improperly excluded.

KAPPER, J. (dissenting):

I dissent. I think error was committed by the learned trial justice in two respects. The first involves what seems to me an expression of opinion by him indicating that the defendant was neither truthful nor candid, a view that was extremely detrimental

to her. The issue of insanity, even if regarded in the light most favorable to the prosecution, was clearly one of fact. It was not, in my opinion, a defense lightly to be cast aside, nor to be regarded, in advance of the verdict, to use a colloquial expression, as "cooked up." But, whether that be so, or not, the defendant was entitled to an absolutely fair and impartial trial of this, to her, most important issue; and any attitude of the trial court which might tend either to *belittle* her in the eyes of the jury, or to *reflect* upon her integrity, should not be passed by as presenting immaterial or technical error. Commencing with the point where defendant was about to state what her thoughts were and how she felt when she got to the decedent's room just prior to the shooting, the court interrupted, saying to her: "If you want the jury to hear your story, you had better talk to them, instead of *whining* about it." Later, the court asked defendant why she did not answer her lawyer's questions, and when she replied, "I didn't hear," there was a retort by the court, "Oh, yes, you did." Again, when defendant was being interrogated whether she cried when under examination by Dr. Meagher, the People's expert, the record shows: "By the Court: Well, you are not crying now, are you? Are you crying now? A. Yes, sir. Q. That is what you call crying, is it? No tears, are there? A. Yes, there are tears."

Possibly, we might disregard these incidents if it were not for later occurrences.

When Dr. Kirby, for the defendant, was under examination, we find the following: "By the Court: Q. You several times referred to the defendant as weeping or having wept while you were making examinations. What do you mean by her weeping? A. Crying, shedding tears. Q. Does that mean shedding tears? A. Yes, sir. Q. *It doesn't mean whining as she is doing here in this trial?* A. No, sir. Mr. Conway: I object to that statement by the Court and I take exception to it. By the Court: Q. You have heard her whine, haven't you? A. Yes. Q. I don't know what you call it. Do you call it whining? Mr. Conway: I take the same exception. A. A moan. By the Court: Q. A moan or whine? A. Yes. Mr. Conway: I take the same exception. By the Court: Q. She has been doing it during your examination and you have heard it? A. In court? Q. Yes, in court, not in jail. A. No, I didn't hear the moan. Mr. Conway: I take the same exception to each of your Honor's remarks. The Court: I made no remarks; I asked questions. If you take an exception, then it is perfectly proper. Mr. Conway: I take an exception to each of your Honor's questions and to what I thought were remarks."

30

Second Department, January, 1925.          [Vol. 211

As I read the foregoing excerpts from the record, I am constrained to say that the attitude of the court was tantamount to a denunciation of the defendant as a malingerer, and that what occurred was calculated to convey to the jury the court's opinion that the defendant was endeavoring to deceive them, and was pretending emotion. It seems to me difficult to entertain any implication from what occurred other than that the trial court expressed his opinion that the defendant was falsifying emotion. And if this be so, the jury must also have entertained the view that if she attempted to deceive them she must likewise have attempted to deceive the various doctors who examined her, and that no reliance could be placed upon their testimony based, as it largely was, upon their examinations of the defendant. In this respect, I think the trial cannot be characterized as fair to the defendant.

*Second.* As to the exclusion of the symptoms, as expressed by the defendant to the examining physicians: The rulings repeatedly made were that the doctors were not to tell what the defendant said to them. These statements were obviously those upon which the physicians based their opinions to a material extent. They were not narratives of past events. They were symptoms of a condition existing at the time of the shooting and which persisted at the periods of the examinations. I think the rulings were erroneous. I do not understand the law to be that an expert witness may not state facts, even though they involve expressions made to him by the defendant while under observation or examination, if his opinion of the defendant's sanity or insanity is based thereon.

It is thought by some of my associates that as the hypothetical question put to the doctors contained the substance of the excluded expressions, the rulings eliminating the defendant's statements to the doctors and which they regarded as symptomatic, were harmless. It seems to me clear enough that if important factors contained in a hypothetical question are not allowed in evidence the question even though it contained the excluded matter is of no value to the party. From the record, as it unfolds itself to me, the jury may well have concluded that the court was excluding practically all complaints, or symptoms, described by the defendant to her doctors, thus leaving nothing but a barren opinion by them without an intelligence of the facts upon which such opinion was based. But, whatever may have been the jury's view, I am of opinion that the rulings excluding what the defendant said to the physicians, and upon which they based their opinions of her insanity, were erroneous.

Judgment of conviction affirmed.