# THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MANNING STREWL, Appellant.

Third Department, March 17, 1936.

*Daniel H. Prior* [*George H. Smith* of counsel], for the appellant.

*John T. Delaney, District Attorney* [*Henry S. Kahn* and *James J. McGuiness, Assistant District Attorneys*, of counsel], for the respondent.

HILL, P. J. Defendant has been convicted of participating as a principal in the crime of kidnapping John J. O'Connell, Jr., on the early morning of Friday, July 7, 1933, his alleged part in the crime being that he planned it, counselled in regard to the holding of O'Connell and as to the place of his detention and actively participated in obtaining $40,000 paid as ransom by Daniel P. O'Connell (who will be mentioned in this opinion as O'Connell, Sr.), an uncle of O'Connell, Jr. He has been sentenced to imprisonment in a State prison for fifty years.

O'Connell, Jr. (a man twenty-four years old), returning from a social engagement about one o'clock Friday morning, stopped his automobile in front of his father's residence on Putnam street in the city of Albany. As soon as he switched off the lights and motor a man opened the door, pointed a gun and commanded him

to get out of the car. When he got out through the door opposite the one which his assailant had opened, he was seized by four or five men, his eyes and mouth were covered with adhesive tape. He was taken to another automobile and finally to a truck in which he traveled to the place in or near New York city where he was held prisoner until late Saturday night, July twenty-ninth, when he was taken blindfolded a considerable distance and turned over to this defendant who, at the request of O'Connell, Sr., had come with the ransom money to get him. O'Connell, Jr., testifies that from photographs he has identified John Oley, Francis Oley and a man named Geary as among those who seized him in front of his father's residence, but says that defendant was not one of the number.

Several members of the O'Connell family reside in and about Albany. O'Connell, Sr., is the recognized head of the family. They are well known politically in the city and county. During Friday, July seventh, the day when O'Connell, Jr., had been kidnapped in the early morning, a telephone message was received at the office of Edward O'Connell (a brother of O'Connell, Sr.). " Tell Eddie to tell Danny to go down to the post office to get a letter that is there for him." On the following day, O'Connell, Sr., obtained this letter from his post office box:

" I am being held for ransom. I am getting the best of care, but please do whatever the [sic] ask, as I think I am in a tight predicament. They want two hundred and fifty thousand dollars in 5's, 10's, 20's. They seem to know all about it, so please do whatever you can for me. They want you to publish in the Knickerbocker Press Sunday about a dozen racketeers' names known locally to act as go-betweens to collect the ransom. Have it put in the personal column addressed Sedgwick. In order not to make this affair too public, the following system will be used: For instance, if the name happens to be ' Pet ' "—And underneath, under each lettering, under " P " is " 16," under " E " is " 5," under " T " is " 20."— " If the name happens to be ' Pet,'— 16 5 20." * * * In short, instead of using letters, use numbers. Now, to make sure that you are dealing with the correct people, they will at all times when they communicate with you use the name, ' Sedgwick.' Instructions will follow Monday.

" JOHN O'CONNELL, JR."

This and other letters later mentioned and quoted were not in script but printed by hand, except one that was typewritten. O'Connell, Jr., in his place of confinement would write his signature on a blank sheet, and the message would be printed later by some one of the criminals. Following the receipt of this letter, O'Connell,

Sr., John O'Connell (father of O'Connell, Jr.) and John Murphy (a personal and political friend and associate of O'Connell, Sr.), made up a list containing the names, Jimmy Gilloughly, Pat Casey, John Oley, Fred Carroll, Tom Lynch, Barney Riley, Tom Dyke, Mush Tractner, Bindy Riley, Ames O'Brien, which was published in the *Knickerbocker Press* on Sunday, July ninth. The following day O'Connell received a second letter: "Dear Uncle Dan. Names not satisfactory. Mention some right names. Use same method. Use Times-Union Monday. Sedgwick." (This was the typewritten letter.) The same persons who made up the first list caused the names of Dave Hotaling, Bob Parr, Bill Bardean, Paul Carroll, Rock Tarzio, Eddie Gorman, Pat Coffey, Mike Connolly, Joe Leone, Willie King, Neal Ponze, to be published in the *Times-Union.* On Thursday (July thirteenth) O'Connell, Sr., received a special delivery letter that had been posted at Grand Central, New York city, the day previous at seven P. M.:

"We know it is no fault of your's that it reached the papers. From now on you will use the name 'Rex.' Not satisfied with names. Instructions for second is as follows: In the New York Evening Telegram you will put in the personal column, as follows, four names. For instance, to do it as follows: 'Dear Rex: Am in New York. Please get in touch with — Name S 3. End by signing a fourth name.' Do same in Evening Journal and Sun. Twelve names all together, all local racketters."

"REX."

Again the same persons who had prepared the first and second lists caused the following list of names to be prepared for publication: In the *Journal,* Sylvester Hess, Fred Roma, Terry Riley and Tom Tyndall; in the *World-Telegram,* Charles Wachter, Tony Condi, Manny Strewl (the defendant) and Willie Martin; in the *Sun,* Jim O'Connor, Dave Sherman, Joe Curro and Al Freedman. John Murphy, the friend of the O'Connells, took the advertisements to New York and arranged for the publication. On redirect examination, O'Connell, Sr., says that when the lists for the *Sun, World-Telegram* and *Journal* were made out, he and his two associates were in touch with the district attorney of Albany county by telephone. On the day after these publications, Tommy Dyke (he was not called as a witness), who had been named in the first list published, asked O'Connell, Sr., to meet him at the Elks Club in Albany, and there arranged that O'Connell, Sr., meet defendant in Washington Park near State street. At this meeting, which followed immediately, defendant gave O'Connell, Sr., the following letter:

"*Friday*, 14/33. MANNY STREWL: You no doubt are acquainted with the O'Connell people so you can be of great service to them. We have checked on you and decided to pick you as our go-between, and if you are willing, in the event you are, you will insert this ad in the World-Telegram personal section. 'Roma, get in touch with me. Manny.' Do this promptly and do not change your habits if you care to be of service. Secrecy at all times is necessary. This is genuine by John's signature only. Roma." " This is genuine.

"JOHN O'CONNELL, JR."

O'Connell urged Strewl to undertake the negotiations for ransom and asked him to go at once to New York to arrange for the advertisement mentioned, offering a substantial sum of money for expenses, but it was decided that Murphy should procure its publication through an attorney in New York. O'Connell, Sr., in the talk told Strewl that $250,000 had been demanded in earlier letters which he had received; that the father of O'Connell, Jr., had no money and that he had no money; that the brother who was an attorney had attempted to raise money and so far had gotten only $20,000, and requested that Strewl, if opportunity came, offer that amount as ransom. Within a few days Dyke again asked O'Connell, Sr., to meet Strewl. At this meeting Strewl told O'Connell, Sr., that a day or two previous he had been approached from the rear as he was walking on a street in Albany and told to go to Schenectady, where he met and communicated to a person the $20,000 offer; that he had just received a letter which he turned over to O'Connell. The first part addressed to "Dan" says, "Heard from Manning. What you offered was really an insult. What kind of people do you think you are dealing with. What we want is action one way or the other. If you want John alive, kick in 250 G's. If you want him the other way, why, we will accommodate you. We haven't much sympathy for your kind." This is followed by other threats and demands and is signed "Roma." At the bottom of the letter it is addressed: "Manning: If you get the money tomorrow or decision, have all your shades in your home drawn to the bottom." O'Connell, Sr., testified that upon reading this he said, " Well, I told him that we were still working on the money and had — had got up to about $23,000 or something like that, or $25,000, and that we were doing the best we could with money, but the thought of $250,000 was more than anybody could raise." Dyke arranged a further meeting which took place in the park, where Strewl delivered another letter, part addressed to "Dan" and part to "Manny." Again in this letter $250,000 was demanded. At this time defendant told O'Connell, Sr., that his

partner John Oley (whose name had been published in the first list made out by O'Connell, and whom O'Connell, Jr., in his testimony says he identified as one of his assailants when he was seized in front of his father's home), objected to his continuing to act as go-between, and suggested a meeting between O'Connell, Sr., and Oley. O'Connell said he would meet Oley at " Joe Lieberman's room in the Ten Eyck hotel." This meeting took place within half an hour. O'Connell, Sr., details the conversation with Oley: " John Oley said that he thought his friend Manny would get himself in trouble by acting as the go-between and that he might get he [sic] John Oley, and his brother Francis in trouble, having been together a long time and had been partners in business and that he had been told then that — by the Albany police or somebody on the Albany police that they were marked — that John Oley and Francis and Manny were marked as the kidnappers. I said ' I don't think that is so. I haven't heard anything like that,' and then we talked about the money matters."

O'Connell and Strewl met again in the park on July twenty-second. That meeting is described by O'Connell: " Well, he gave me the letter and it was a letter written in the boy's handwriting, and he said that he was sick, and I told Strewl that we couldn't get any more money and that we were then up to about $25,000, I believe, and that when he left me he told me if he heard — if he heard any more from them that he would let me know what was said. * * * He then told me that — Strewl told me then that he didn't care to meet Tommy Dyke; that it was hard to find Tommy Dyke when he wanted him, and lots of the newspaper men had seen them meeting on the corner, and he wanted me to call on his attorney Mr. Snyder."

The following day (Sunday) O'Connell, Sr., called the attorney Louis Snyder and asked for a conference on Monday. O'Connell tells of the meeting with Strewl at Snyder's office on Monday: " Well, Manny told him about the amount of money that they were asking, and the difference in the money, that is, the amount that we had, and that the police were tailing him, that the prowl cars were around and so on and so forth, and I think Mr. Snyder said — or Mr. Snyder said ' Well, that one car, I looked that up myself and that was a newspaper reporter.' And so Mr. Snyder said that — wanted to know if we couldn't get any more money and if we couldn't, why have Manny go down and offer them what you had again and see what would happen," and there was further conversation detailed about the activity of the district attorney and police. O'Connell tells of another meeting had in Snyder's office on Friday, the twenty-eighth. " Manning Strewl said that they would

take $75,000. * * * I told him that I would do what I could in the matter, but I didn't think I could get any more money, that that was as much money as could be raised. And I left the office and was to call back later in the afternoon. * * * Q. And how much money did you tell them that you had at that time? A. $40,000. * * * I called at four o'clock and I told Mr. Snyder that I was able to raise $2,500 more which made it $42,500 and he said ' I will let Manny know.' "

Following this Strewl and Snyder went to the home of O'Connell, Sr., who gave them two packages each containing $20,000 and $2,500 loose in bills, the letters which the kidnappers required to be returned (except two which Snyder had held out), a revolver and a letter signed by O'Connell, Sr., saying that Strewl was his friend and was on business for him and if any one wished to check on that statement to call O'Connell, Sr., at his summer home. Strewl and Snyder at once left for New York. The following morning Snyder called O'Connell and said the kidnappers refused the money as they thought it was marked, and arrangements were made by O'Connell, through the State Comptroller's office, to have the money changed at the Bank of Manhattan. O'Connell, Jr., Snyder and Strewl arrived at the summer home of O'Connell, Sr., about three o'clock Sunday morning. O'Connell, Sr., describes the arrival. " I went out just about as quick as I could," inquired for the health of O'Connell, Jr., greeted Snyder and Strewl and invited them into the house. There were present Chief of Police Smurl, the district attorney, Detectives O'Connell and Dolan, and several other police officers. One of these persons asked Strewl into the living room where the officers examined him concerning the kidnapping. O'Connell, Sr., was in and out of the room, and O'Connell, Jr., " was in the chair in the same room * * * while Captain Oliver was talking to Manning Strewl." The evidence of O'Connell, Sr., as to the length of time that Strewl stayed with the detective is, " Well, I will say an hour." After that Snyder was questioned, and Snyder and Strewl left the O'Connell summer home together. During the time that Strewl was in the living room he returned the $2,500 which had not been turned over to the kidnappers. He had mentioned to O'Connell, Jr., on the trip from New York the fact that he had held out that amount. The foregoing recital as to the negotiations concerning the ransom and the return is as detailed by O'Connell, Sr., upon the witness stand, except where otherwise indicated.

Attorney Snyder was sworn on behalf of the defendant and gave evidence as to some of the occurrences mentioned which places Strewl in an even more favorable light than the O'Connell, Sr.,

version. O'Connell, Sr., was not called in rebuttal. Concerning the first meeting at his office, Snyder says, " He called at the office with Mr. Strewl and asked me if I would assist in any way possible, and I agreed to do so. He said ' whatever your fee is I will be glad to pay it.' I said, ' there is no fee in this, I am not handling this as a legal matter.' * * * ' Well ' he said, ' for your protection draw up a retainer and I will sign it retaining you as my attorney.' I said, ' Dan, I don't need any protection and ' I said ' as far as retainer, I am not expecting any pay for the services and there is no necessity for your signing it.' ' Well ' he said, ' I am also retaining you as Mr. Strewl's attorney.' I said ' that isn't necessary either.' I said ' you give Mr. Strewl your instructions or tell me what — in what way I can assist you and I will be glad to do it.' He said, ' I requested Strewl to take $20,000 to the kidnappers and Strewl has refused to go alone.' I said, ' Dan, why don't you go with him? ' ' Why,' he said, ' you know I couldn't go. I am the man that was to be kidnapped.' We sort of laughed about it and I said, ' Why, Dan, if it was a member of my family, I would go, if I had the opportunity of being of any service, and I think that they might consider negotiating with you. You are a man that has influence and in the sporting world, and they might consider discussing the matter with you.' He then said his reason was more than that, that it might not be well if too many were to negotiate. I said — told them then that I really didn't want to appear at all in the matter, and I suggested that we go to the district attorney's office. He said, ' No, there is no necessity of our doing that.' ' Well,' I said, ' Strewl really consulted me on this and told me that he had received information that he was to be framed in the case.' I am using his phraseology. ' That as soon as this kidnapping was solved that he would be arrested and accused of the crime.' I said, ' In view of the fact that he made that statement to me, I questioned him at length, in order to ascertain whether there was any foundation for that rumor.' I said,' If there was, I certainly did not want any connection with it, and,' I said, ' I am fully satisfied that the rumor was either false or without any foundation.' He said, ' I know that that is false, and,' he said, ' it is natural for the police and the district attorney's office to be working on this case.' "

As to a subsequent meeting at his office, Snyder says: " Mr. O'Connell then asked him to take $25,000 to New York. Strewl said ' Yes, I will go, if you will go with me or somebody that is close to you. * * * Now, you know that there has been a rumor about my being accused of this crime and * * * what if I am on the way to New York and should be held up and this money taken away or what if I should bring the money to New York and they

should accept it and not deliver the boy, or what if anything else should occur that might cause further suspicion on me? * * * I absolutely refuse to carry any money in this transaction, but will assist in every other way possible.' "

He describes the language used by O'Connell when he increased the ransom offer from $25,000 to $40,000: " Mr. O'Connell then said ' I found $15,000 that I didn't know I had and I want to send down $40,000. Strewl take it to New York and tell them that is the best I can do.' "

As to the addition of the $2,500, his testimony is substantially like O'Connell's. He says that when O'Connell, Jr., Strewl and himself arrived, O'Connell, Sr., " came out and shook hands with us and threw his arm over my shoulder and thanked me, and did the same to Mr. Strewl." From anything that appears in the record, Snyder is quite as entitled to be believed as O'Connell, Sr.

O'Connell, Jr., testifies that in the late afternoon of the first day he was in his place of confinement, defendant came into the room. This was long before Strewl had become the emissary for O'Connell, Sr. His testimony is: " Well, then next — that afternoon, or late in the afternoon I would say, there was a man came in and started to ask me about the go-between. * * * Why, my head — I was lying on my back, my left arm was attached to the bed with the handcuffs. Q. And were you able to see at all at that time? A. Yes, I could see. Q. Distinctly? A. Yes, I could. Q. How could you see? A. Why, under the bandage. It just came down to about the middle of my nose and I could see outside of each corner of the bandage, right through here [indicating]. Q. Now you say this other man came in there that evening? A. Yes sir. Q. Can you tell the jury who that man was? A. Yes sir. Q. Who? A. That man sitting right there [indicating defendant]. * * * He asked me if — to name some go-betweens, the men that were in the money and some local racketeers. * * * He walked right in the room and sat down on the bed. * * * I could see him out under the bandage. * * * Why he walked to me and then he sat on the bed and then after I told him quite a few names and they weren't satisfactory * * * ' why ' he says ' you will have to have some — name some local racketeers that have money ' and I started to name a few men that I knew and I says ' I don't know many racketeers around Albany ' and he says ' Well, you will have to think it over a while ' and he walked out of the room. * * * Why he came back in the room again and asked me some more names. * * * Well after that he came back in again * * * so I told him that was all I could think of, and so on, and so I said ' you better get in touch with Ed or Dan and ask the family. They

can name more than I can. They know more people than I do.'
* * * Well, after that they went out of the room and I was
left to myself."

He did not see the defendant there again. At other places in
his evidence he gainsays his statement that he could see. Describing the manner in which he signed his name to the ransom letters,
he says: " They brought in a pen and a bottle of ink. Then the
man would lift the bandage. I would be sat up in a chair. Q. Sat
up and the man would lift the bandage? A. That is right. Q. And
I think you said you would have to wait a few minutes until you
could see. A. Yes sir, on some of the occasions. Q. And did
you wait a few minutes so you could see on how many occasions?
A. Well, I couldn't see the letters that I wrote within the first
week that I had the bandage on me steady."

This claimed visit by the defendant was on one of the early days
of the first week.' On the cross-examination as to the claimed
recognition, he gave the following evidence: " Q. What time was it
that you say Mr. Strewl talked to you about a go-between? A. It
was late that first evening or — Q. About what time? A. Well, I
couldn't have any way of telling the time. I had no watch —
Q. Well — A. Or couldn't see anyway. Q. You couldn't see?
A. That is, couldn't — Q. It was dark? A. Couldn't see the watch
if I did have one."

He describes the bandage: " Well, it was a piece of cotton maybe
about six to eight inches long, just enough that it would cover my
face, and that was bound with adhesive tape, and then there was
a piece of gauze on that that went on both sides — just around my
ears and up over the top of my head."

He says that he recognized Strewl as his visitor of the first day
within a very few minutes after he got into the car *en route* for
Albany. If this is true, it seems peculiar that he remained silent
on Sunday morning as he sat in the room (as testified by O'Connell,
Sr.) while the district attorney, chief of police and detectives questioned Strewl, and raised no objection when Strewl left the place
a free man. Also, although as his uncle says, the district attorney
and Captain Oliver questioned him that morning concerning the
kidnapping, he remained silent for two days thereafter. In answer
to the argument that this is explained by his shocked and dazed
condition, it might be said that if he was not too dazed to recognize
Strewl, he should have been able to talk.

Snyder says concerning the trip from New York to Albany,
" He [O'Connell, Jr.] then threw his arm over Mr. Strewl's shoulder.
He said ' I will never forget you either, Mr. Strewl, and if I can ever
do you a favor I will do it.' " Further, bearing on the identity of

those who came to the place of detention, " He said they disguised their voices by putting slugs or some insert in their mouths. He said their voices were all muffled, but he said ' I know that they were all Italians.' * * * I said, ' couldn't you identify any of them Johnny? ' He said ' No.' He said ' my eyes were covered up and ' he said, ' they are awful sore now.' " There was no rebuttal to this testimony. O'Connell, Jr., was quoted in an interview published in the Albany *Times Union* of July 31, 1933 (Monday), concerning his ability to identify the persons who came to the place where he was held a prisoner. " I spent the entire three weeks in that bed room on a bed. I occasionally heard voices in another room, but do not believe I could identify any of them. I was alone most of the time. My feet were tied together and I was handcuffed. This proved to be rather uncomfortable, but the only mark I have from it is a small one on one wrist. Several times I was given white pills of some kind. I don't know what they were, but they made me perspire and feel drowsy. Because of the blindfold I had no opportunity to see any of the persons guarding me. My eyes were not taped, except to hold the edges of the bandage. Several times I was required to sign messages sent to my family by the kidnappers. The latter were very careful that I should not see them on such occasions. The bandage was lifted slightly, just enough for me to see the edge of the paper where I placed my name. The bandage wasn't tight enough to hurt my eyes, and they suffered no serious effects from looking for three weeks at cloth." His uncle is also quoted in the same paper as saying, " He didn't recognize any of the men who guarded him."

The witness Gross, giving his residence as Toronto, Canada, states that on an occasion he went to the Century Hotel on Forty-sixth street in the city of New York, and to the room of a Margaret Campbell. " I came in there between 6:30 and 7:00 and I knocked on the door. * * * When I came in I was introduced to Manny Strewl and to John Oley. * * * Manny made the remark ' I heard about you.' * * * Phil Zigler and Al Fisher was lying on the bed there and they been smoking the pipe. * * * I suppose it is an opium pipe. * * * Manny Strewl was seated in the corner right next to Benny Olinski and John Oley was ready to leave the hotel — leave the room. * * * Then John Oley, Benny Olinski and Al Fisher got up from the bed and they left the hotel. Manny Strewl remained there with Phil Zigler and I. I heard Phil Zigler ask Manny Strewl ' How old is O'Connell? * * * How old is the old man O'Connell? ' * * * and Manny Strewl answered ' he is a man about fifty.' Then he said ' what do you care for the old man O'Connell? If we

can't get the old man O'Connell we will get the young man O'Connell, * * * because he is one child between three brothers and then his uncle will pay any amount without the law without the public shall know. * * * That is all I want from you Phil, you get the kid and get me a spot and I will take care of the money.' * * * Manny Strewl told it to Phil Zigler. * * * I and Manny Strewl and Phil Zigler went down in the elevator and went down on Broadway. While walking Manny Strewl made a remark to Phil Zigler, ' Phil, I will give you three days time to get the spot and the boy, and if not I am going to look up a different mob' and I left them."

In this witness' direct testimony he fixed the day of this conversation as the middle of the month of November, 1933 (more than four months after the kidnapping). On cross-examination he changes the date when he first met Zigler in New York to " Since July, 1933." Later he was asked: " When was this visit of yours to the Century Hotel " and he answered, " It was in August, 1933." Finally, however, he says that he was "mixed up." " I want to make it sure. In February, 1933. Q. February, 1933? A. Right. Q. Why did you tell me it was August, 1933? A. Well, I took it right back to make it sure. Q. I know you did. A. See? Q. But I want to know why you told me it was August, 1933? A. Because August I came into the Department of Justice and I remember the date. That is why I was getting mixed up. Q. What was the date that you came in here to the Department of Justice? A. The 17th." The witness says that he had known Zigler in Detroit and New York for six years; that he had known Olinski from January, 1933, but did not know his business. He says concerning Zigler: " I know he has got big mob connections. He was connected with big mobs. * * * He told me that, yes. * * * He mentioned that — kidnapping mobs. * * * He told me that when I came in here in January, * * * 1933. * * * Q. You had been looking for him and after that, of course, you associated with him all the time you were in New York, every visit you made? A. Right. Q. Knowing that he was a kidnapper? A. Right. Q. Knowing that he was a gangster? A. Right."

In 1933, at about the time of the Jewish Easter (early April) Zigler, Fisher and Olinski went to the home of Gross in Toronto and stayed there three weeks. According to the witness they would come into the house at two or three o'clock in the morning after he had gone to bed, and would be sleeping when he left for business. Their visit terminated when the Toronto police arrested them for possessing burglar tools. During their visit " They been talking kidnapping a fellow by the name of Mush Trackner."

(This is one of the names contained in the list published by the O'Connells as a proposed go-between.) Further conversation during this visit at the Gross home in April, 1933, is disclosed by the following questions and answers: " Q. And yet, of course, you can't tell me what you and these three kidnappers talked about up in Toronto, can you? A. Well, I tell you we talked — Q. I mean, you forget that? A. We talked the O'Connell case? I forget that. Yes sir."

The witness says he did not see his guests from April until in August, 1933. If this man's evidence be true, for months he had knowledge of this proposed kidnapping and made no disclosure to prevent the perpetration of this most serious crime. The reason he gives for finally telling the story is illuminating: " Q. And I suppose when you heard that John O'Connell was kidnapped that you felt some guilt about it yourself? A. No. Q. Having heard the plot made to kidnap him, didn't you feel that — well, didn't your conscience feel rather guilty? A. Not when I been reading the papers about it, no. Q. Not when you were reading the papers about it? A. Right. Q. Well, when did your conscience begin to feel guilty? A. When I saw this man's picture in the paper, the Chicago man's picture in the paper and with the story in the paper or statement of President Roosevelt that everybody should try to get the kidnappers of John O'Connell. That is the time. Q. That is the time when your conscience began to feel guilty? A. Yes, sir."

The story which the witness tells as to the reason for his visit to New York in February, 1933, is fantastic and chimerical. Comment upon his evidence and the credence which it should receive is unnecessary.

Three handwriting experts were sworn by the People. They expressed the opinion that the letters were written by the defendant. The force of the evidence of the handwriting expert sworn on behalf of the defendant was entirely destroyed on cross-examination. He was confronted with a letter which he had written the district attorney wherein he expressed the opinion that the defendant wrote the ransom notes. His testimony to the contrary has little value.

Concerning the legal errors committed on the trial. The defendant sought to prove his statements and communications made to Attorney Snyder while they were going to New York and while there with the ransom money. Snyder was permitted to tell of Strewl's movements and acts on that Friday night and Saturday, so far as known to him. Strewl left Snyder late Friday night and after an absence of some hours, returned. Snyder was permitted to tell that he telephoned O'Connell, Sr., that the kidnappers had

refused the money brought down from Albany because they believed it to be marked and of the arrangements as to the exchange of that currency at a bank, but nothing that Strewl said to Snyder explanatory of his goings and comings was allowed. The acts and movements of Strewl were admissible and his statements which were excluded were likewise admissible to show his intent and the purpose of the acts. Such statements have been defined as " verbal acts." (*Bishop* v. *New York Times Co.*, 233 N. Y. 446; *Cyrowski* v. *Polish-American Pub. Co.*, 196 Mich. 648; 163 N. W. 58; *Weston* v. *Barnicoat*, 175 Mass. 454; 56 N. E. 619; *Hubbard* v. *Allyn*, 200 Mass. 166; 86 N. E. 356; *Hine* v. *N. Y. Elevated R. R. Co.*, 149 N. Y. 154, 162; 2 Ford Ev. 892, § 170.) At the time these statements were made the crime was still continuing. Defendant's contention is that he was acting innocently as the agent for O'Connell, Sr., in the negotiations for the release. The contention of the People is that he was one of the criminals, and that all his acts and statements were those of a guilty man. The jury was to decide whether he acted with a guilty or innocent intent. His statements that accompanied the acts would aid the jury in deciding. (*People* v. *De Simone*, 225 N. Y. 261, 265; *Crenshaw* v. *State*, 205 Ala. 256; 87 So. 328; *Grimes* v. *State*, 68 Ind. 193; *Garber* v. *State*, 4 Coldw. [Tenn.] 161; *Brown* v. *State*, 74 Tex. Cr. 356; 169 S. W. 437; *Hine* v. *N. Y. Elevated R. R. Co.*, *supra.*) I quote from the opinion in the New York case last cited: " The ruling of the court was within the general principle, that when an act or transaction is itself admissible, statements or declarations of the party at the time, calculated to explain and elucidate the character and quality of the act and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are admissible as part of the *res gestæ*. (*Waldele* v. *N. Y. C. & H. R. R. R. Co.*, 95 N. Y. 278; *Wilcox* v. *Green*, 23 Barb. 639; Greenleaf on Ev. §§ 108, 109.) " (*supra*, p. 162.)

Defendant at the request of O'Connell, Sr., and with the approval of the public officials, made the trip to New York. O'Connell, Sr., had written a message to be carried by Strewl that he was O'Connell's friend and on his business. It was necessary that Strewl contact and deal with the kidnappers in order to carry out his mission for O'Connell. Now that the O'Connell attitude of friendship and trust has changed to accusation, and Strewl is charged with criminality, his every act, with the accompanying statements and declarations which are " calculated to explain and elucidate the character and quality of the act," are admissible, that the jury may decide whether Strewl acted as O'Connell's friend and agent or as a criminal. The exclusion of this evidence was a repudiation

of the presumption of innocence. (3 Wigmore Ev. [2d ed.] § 1732.) In this connection the author says: " Then it is further suggested that at any rate the accused, if guilty, may have falsely uttered these sentiments in order to furnish in advance evidence to exonerate him from a contemplated crime. But here the singular fallacy is committed of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proved guilty; in other words, the fundamental idea of the Presumption of Innocence is repudiated." (p. 713.)

Upon the same principle, Strewl's declarations to Snyder before going to New York and not in the presence of O'Connell, Sr., were admissible. O'Connell, Sr., met with Strewl and Snyder, his attorney, and expressed confidence and faith that Strewl was his helper and friend, and approved the arrangement that Snyder should represent and protect Strewl, and offered to pay Snyder to act as Strewl's attorney. Now, when the prosecution changes this attitude and seeks to establish that Strewl, a guilty man, sought Snyder's aid to protect him from the consequences of his guilt, every physical and verbal act should have been received that the jury might determine the intent.

The charge is very brief, using less than sixteen of the twelve hundred and nine pages of the record. No exception was taken. It does little more than to recite the rules required under the statute, and the theory of the prosecution. It will be read in vain to find an affirmative statement that defendant should not be convicted if he, as O'Connell's agent, met and associated with the kidnappers in an effort to effect the release of O'Connell, Jr. By some, criminality might be assumed for such acts because of the general inhibition against bribery and the condonation of felonies.

James O'Connell (not a relative of the Albany O'Connells) was the only detective called. From his testimony it appears that others were present during the conversations at the O'Connell residence on the Sunday when O'Connell, Jr., returned; that he assisted Detective Dolan in arresting the defendant about midnight on Sunday. Dolan, according to O'Connell, " scuffled " with Strewl so forcibly that ten days later Strewl had a black eye. O'Connell and two other detectives were present while Strewl was required to print the exhibits that were used by the handwriting experts. The court, by granting a request made by the district attorney, left the jury to imply that the presumption that arises on the failure of a party to call a witness who is under his control did not apply to the failure to call these additional detectives for the reason that their testimony would be cumulative to that given by O'Connell. Under the circumstances this was error.

During the cross-examination of O'Connell, Sr., defendant's attorney asked whether he had made the statement attributed to him that appeared in an Albany newspaper of July 31, 1933. The court stated, " No, I am not going to permit you to read the statement from a newspaper. If you want to refresh his recollection from a newspaper, you can ask him to read the statement." This was an incorrect ruling. It was not cured by permitting the later questions concerning fragments of the statement.

A magnifying glass not in evidence was in the jury room. This would not be very harmful except that the defendant's attorney in his summation, referring to printing which the witness Gross had done at his request, pointed out the similarity between it and the ransom notes. This was answered by the district attorney with the assertion that the defendant's discredited handwriting expert had tampered with the exhibits after Gross had written them. There was no evidence to this effect; however, the district attorney stated concerning the Gross exhibit: " If you take it, if it is given to you afterwards, and you have a glass in your jury room, just look at it and see for yourselves and determine for yourselves whether or not this man [the defendant's handwriting expert] didn't do something with that exhibit that he wanted to get." With such a statement in the summation, the investigation as to who caused the magnifying glass to be sent to the jury room was hardly necessary.

After the jury had returned a verdict of guilty, an information was filed under section 1943 of the Penal Law (added by Laws of 1926, chap. 457) and a hearing had as to whether Strewl had been convicted in the United States court for burglarizing a freight car. The judge who presided at that trial had been the United States District Attorney at the time the indictment for burglary was returned. The court stated: " Well, I will admit, for the purpose of the record, that I was United States attorney for the Northern District of New York at the time of the return of the indictment against *this defendant.*" The issue on trial there was not kidnapping but concerned a matter in which the judge had been an attorney. (Judiciary Law, § 15; *People ex rel. Kennedy* v. *Gill,* 147 App. Div. 924.)

The defendant was arrested around midnight on the day on which he had returned from New York with O'Connell, Jr. His condition ten days later when he was in court on a writ of habeas corpus indicates, as does the testimony of Detective O'Connell, that he was roughly handled. At the time of the arrest, the detectives had no evidence, which has been produced upon the trial, that indicated his guilt. They had examined O'Connell, Jr., that

morning but, if his testimony be true, he did not then tell that he recognized Strewl as having been in his room at the place of detention. If reliance is to be placed on anything that Gross said, that was not known to the detectives, for he told no one until just prior to August seventeenth, and of course, the handwriting experts had not then been consulted, as Strewl wrote the standards for comparison after his arrest. If there be more evidence, and that which justified these officers in what seems to be a high-handed proceeding, it should have been placed before the jury.

O'Connell, Sr., through his advertisement and emissary, Tommy Dyke, first met Strewl. There is no indication of guilt in their subsequent meetings and transactions. Strewl, if innocent, accepted a dangerous commission. He was intrusted with $42,500 with instructions to pay it as ransom. He effected the release for $40,000 and returned the balance to O'Connell. This is strange conduct if he was one of the kidnappers. He is accused by Gross, who shows himself to be unworthy of belief, because, if his story be true, he knew that the kidnapping was to take place for months in advance of the event, but told no one. Also, the details of his story are not impressive. The handwriting experts gave opinions founded upon stated reasons. Giving full force to the reasons and theories of the experts, the comparison of the ransom notes with the standards does not convince one beyond a reasonable doubt that defendant wrote the ransom notes. In fact, the variances between the two outnumber the similarities. It should be remembered that the ransom notes were hand printed with a pen. Printing is not as readily identified as script. Lastly, we have the identification by O'Connell, Jr. I have earlier referred to his contradictory statements and his failure to give the vitally important information which he says he had, when it would have been most natural that he should tell. Evidence is now easily available that will tend to clear up some of the uncertainty as to the claimed identification by O'Connell, Jr. There appeared in the Albany *Times Union* of Monday, July 31, 1933, two verbatim statements, one by O'Connell Sr., the other by O'Connell, Jr. The latter stated his inability to recognize those who were in his room at the place of detention, and O'Connell, Sr., quoted the younger man as being unable to recognize any of the men in the room. These statements were categorically denied by the O'Connells, but the fact remains that either the statements were made or this reputable newspaper was guilty of an intentional misstatement. An examination of the paper (Exhibit C for identification) discloses the general news article accompanied by the two quoted statements where each of the O'Connells speaks in the first person. The reason may only be conjectured for the

failure of the defense to call the newspaper reporters and editors as to the making of these statements. The recent judicial history of the State furnishes a reasonable explanation. Many reporters and editors, with the approval of some attorneys, have asserted that communications to them and their sources of information were privileged. The error of this assertion has been finally determined. (*People ex rel. Mooney* v. *Sheriff of N. Y. County*, 269 N. Y. 291.) Upon another trial there will be no uncertainty on this issue, and the evidence will be available. If it then appears that these statements were made, it will furnish another strong contradiction to the claim of identification.

One of the most serious of crimes has been committed. It is important that the perpetrators be apprehended and convicted. It is equally important that this defendant shall not remain in prison the remainder of his life unless his guilt be established beyond a reasonable doubt, after a trial without the substantial errors here mentioned.

I favor a reversal of the conviction and a new trial on the facts and in the interest of justice, and upon the law because of the errors assigned.

CRAPSER, J., concurs; RHODES, J., concurs, except as indicated in the following memorandum:

RHODES, J. I concur for reversal on the facts, in the interest of justice, and on the law. In the light of the record before us, the errors in rulings were serious, material and prejudicial.

I do not think the trial judge was disqualified from presiding at the trial of the charge that defendant was a second offender. It is neither shown nor asserted that there was any actual bias on the part of the judge; the only point made is that he was prohibited by statute (Judiciary Law, § 15) from presiding, but the facts do not appear to come within the terms or the intendment of the statute.

Except as herein indicated, I concur in the opinion of Presiding Justice HILL.

McNAMEE, J., dissents in an opinion in which BLISS, J., concurs; BLISS, J., dissents in an opinion in which McNAMEE, J., concurs.

HILL, P. J. Replying to the dissenting opinion by Mr. Justice McNAMEE, which I saw after my opinion was prepared, I refer to the following excerpt from Judge GALLUP's charge: " The crime for which the defendant is indicted, namely kidnapping, is a continuing crime. The perpetration of the crime began in

this case by the seizure of John J. O'Connell, Junior, on or about the 7th day of July, 1933, and was continued by his detention until on the 29th or 30th day of July, and was ended by his release on that date, the purpose for which the crime had been committed having been accomplished by the payment of a ransom." This statement in the charge was unchallenged. (See 8 R. C. L. p. 298.) (*People* v. *Micelli*, 156 App. Div. 756, 758; 216 N. Y. 727.)

McNAMEE, J. (dissenting). Section 1250 of the Penal Law of this State provides, in so far as we are concerned here, as follows: "A person who willfully * * * seizes * * * or kidnaps another, with intent to cause him, without authority of law, to be secretly confined or imprisoned within this state, * * * against his will * * * is guilty of kidnapping." And again (Penal Law, § 2): "A person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a 'principal.'"

The defendant was indicted by the grand jury for the crime of kidnapping John J. O'Connell, Jr., on July 7, 1933, in the county of Albany. That this man was kidnapped by a band of confederates, and that the crime was committed in the city of Albany, no one has assumed to deny. It was not necessary to convey him to New York, or to any other place, to consummate the felonious act. The statute says, "seizes * * * with intent to cause him * * * to be secretly confined." When he was seized with that felonious intent, the crime was complete. These observations, of course, are academic; but I fear their significance is not being given full force in this decision; and the contention that the crime was a "continuing" one until release was effected, so as to admit evidence otherwise clearly inadmissible, is wholly without foundation.

There are other facts in the case which are relevant, to prove intent and motive, which no one disputes; although they form no part of the act constituting the crime. These are that ransom for the release of the victim was demanded by the kidnappers, and was paid; that, to extort the ransom, letters were written by the criminals to relatives of the captive, and were received and acted upon by them. Thus there is left for inquiry only the single question, viz., the identity of the defendant as one of the confederates that seized Mr. O'Connell with the felonious intent mentioned.

There is no direct proof in the record that the defendant did or did not take part in the actual seizure, or that he was or was not present when the crime was committed. The defendant himself

did not take the stand. Therefore, it is necessary that there be proof in this record from which it may be inferred beyond a reasonable doubt that the defendant did participate in the seizure, or there must be proof that he aided or abetted therein, or counseled, induced or procured another to seize Mr. O'Connell.

There is direct evidence in the case that the defendant presented to his confederates the scheme to kidnap John J. O'Connell, Jr., and that he promised to formulate and execute the plan to accomplish that purpose. Of course, such a plan and purpose were carried out. There is also direct evidence in the record that the defendant, in the company of these confederates, came to the victim while he was imprisoned, and while he was to some extent blindfolded and was handcuffed to a bed, and required him to give the names of persons to act as intermediaries between the kidnappers and his relatives, and thus aid in forcing the payment of the ransom; and that the victim was dragooned by some of these confederates to sign blank sheets of writing paper upon which ransom notes, so called, were to be written above his signature; that such writings were received by relatives through the mail, as well as from the defendant personally; and that ransom was delivered to the defendant and his attorney for payment to the kidnappers; and that as a result of the extorted payment Mr. O'Connell was released.

The identity of the defendant as one of the kidnappers was further made evident, if not satisfactorily established, by circumstantial evidence. Handwriting experts of good repute, long and widely known as such, gave evidence that at least some of the letters demanding ransom for the release of the captive were written by the defendant. Even defendant's own expert on handwriting gave support to this conclusion.

It is my judgment that in this state of the record, despite the contention of the defendant that the direct evidence of his identity, was weakened on cross-examination or by the testimony of his attorney, the court cannot hold, as a matter of law, that the defendant's guilt has not been shown beyond a reasonable doubt. On the contrary, the defendant himself, in the first point of his brief, concedes there is a question of fact here. And, of course, if there is a question of fact here, it is almost academic that it is not the province of this court to resolve it; the law assigns that duty and that power to the jury.

It is urged in reversing the judgment that several errors were committed that prevented a fair trial, and justify a reversal. I shall briefly refer to a few of these contentions for which no authority is given, and somewhat more at length to those where cases are cited. It is said that it was error for the jury to have used a mag-

nifying glass in the jury room. There was no proof nor claim that it was anything else. If it were used by the jurors, it but made the truth more evident to those who had need of it. I regard the objection as mere quiddity. (*Gaffney* v. *People*, 50 N. Y. 416, 423, 424.)

It is urged that the county judge was disqualified to try the defendant on the charge of a former conviction, because he had been United States Attorney for the Northern District of New York at a time when a Federal grand jury returned an indictment against the defendant for burglary. The judge did not prosecute the indictment, and had withdrawn from that office before the defendant was tried thereon. He was later convicted. The " cause or matter " before the county judge involved the sentence herein, not burglary, nor a companion nor a kindred cause or matter. (Judiciary Law, § 15.) On the trial of the information here there was no inquiry then into the acts or conduct of the defendant, as to whether he was or was not guilty of burglary, or other crime, but whether he was the person who had been convicted of a certain felony. The matter under investigation was one of identity; and the issue to be decided by the jury was whether the defendant was the same person mentioned in the record set forth in the information. (Penal Law, § 1943.) The case of *People ex rel. Kennedy* v. *Gill* (147 App. Div. 924), cited in the prevailing opinion, appears not to be in point in any degree. There a surrogate assumed to sit in a matter involving the amount and value of the assets belonging to an estate. He had previously acted as attorney in a proceeding in the same estate where the amount and value of the same assets were involved, and the court held that at least one issue in the two proceedings was identical, and that in effect " the two proceedings may reasonably be regarded as one." The courts are not called upon by the statute to resort to fine-spun theories and prophylactic construction to slacken the punishment to be imposed on one whom, upon a fair trial and sufficient evidence, a jury has found to be a felon for the second time.

The prevailing opinion quotes a substantial article from a newspaper, which purports to be a direct statement by the victim, in the first person, after his release. The trial judge on cross-examination permitted a question which incorporated this newspaper article to be put to the witness orally, before the jury, as a contradictory statement out of court. No foundation of any character had been laid for such a question. While the trial judge has a large discretion in the matter of cross-examination, I regard the ruling in this instance as generous to the defendant much beyond what is called for by any rule of law. The witness denied that he made

the statement, or was the author or source of the article, and even characterized parts of it as false; and no attempt was made otherwise by the defendant to prove its truth, or to prove that the witness made or authorized it. But despite these facts, this newspaper article is now quoted on this review as a basis to discredit the testimony of a witness whose respectability is not in question. This amounts to a sweeping aside of the law of evidence. To this I cannot consent.

Subsequently when a similar question, in like circumstances, was about to be put to another witness, incorporating a like newspaper article, the trial judge refused to permit the reading of the article before the jury as a part of the question; but he suggested that it be marked for identification, and the witness be allowed to read it silently. The majority opinion holds this ruling to be error, and then adds, " the statements were made or this reputable newspaper was guilty of an intentional misstatement." I cannot agree with either the law of the criticism, or the logic of the assertion. (*Gaffney* v. *People, supra,* 416, 423, 424; *Romertze* v. *East River National Bank,* 49 N. Y. 577; *Novogrucky* v. *Brooklyn Heights R. R. Co.,* 125 App. Div. 715; *Conrad* v. *Griffey,* 16 How. [U. S.] 38, 44; Richardson Ev. [4th ed.] p. 444.) The contents of the document in question detailed facts in issue, and relevant thereto. It was the clear duty of the trial judge to prevent the reading before the jury of this document which was not in evidence, and the truth of which not only had not been proved, but had been disproved.

The main ground, however, advanced by the majority for a reversal of the judgment is the ruling of the trial court which excluded statements made by the defendant to his attorney, Snyder, in his own favor, while in New York and on his way there with the ransom, three weeks after the kidnapping. To justify this view, it is said that the crime was " still continuing," and that these statements were " verbal acts " (an aspect of *res gestæ*), and were admissible to show intent. The question here is not one of local jurisdiction, or of determining the place of trial, but of evidence. And the charge of the trial judge that the crime was a continuing one does not make the law of the case in a criminal action so as to enlarge the defendant's *rights* under the Penal Law, or so as to permit or to require the introduction of evidence that would be inadmissible otherwise. As before indicated, the defendant was on trial for kidnapping in Albany, not for any act done in New York or elsewhere in releasing the prisoner. The intent with which the defendant spoke or acted in his own favor at this late time was not in issue, nor relevant thereto. Evidence of any relevant act or statement done or spoken in New York by the defendant long

after the crime, of necessity, would tend to inculpate him, or would be in his own favor. The former would be admissible against him, the latter clearly inadmissible for any purpose. It was the identity of the defendant as one of the men responsible for seizing Mr. O'Connell that was in issue. But to support the theory mentioned five cases are cited. Four of these were actions for libel, and one for an injunction and damages. In the first, *Bishop* v. *New York Times Co.* (233 N. Y. 446), the court held merely that certain statements and acts of third persons and acts of the plaintiff were *not* admissible on the question of damages; although the dissenting opinion (p. 461) cited the four other cases referred to as illustrations of *res gestæ*, or verbal acts, and their bearing on the question of damages. In these other libel cases of *Hubbard* v. *Allyn* (200 Mass. 166, 174; 86 N. E. 356); *Weston* v. *Barnicoat* (175 Mass. 454, 456; 56 N. E. 619) and *Cyrowski* v. *Polish-American Pub. Co.* (196 Mich. 648; 163 N. W. 58) statements by other persons were admitted in evidence in connection with their refusal to deal or associate with the plaintiff on account of the libel, to show the damages sustained. In the injunction case (*Hine* v. *N. Y. Elevated R. R. Co.*, 149 N. Y. 154, 162) it was held that statements by tenants when refusing to retain their apartments at the same rent because of the presence of the elevated structures, were admissible to prove loss of rental value. It is quite clear that these cases are not authorities for the admission of statements of the accused, made three weeks after the crime to be proved, on the question of identity. And the fact that it is now contended that the defendant was the " agent " of a relative of the victim in delivering the ransom and securing the release, in no way altered the situation. This action is not one between the O'Connells and the defendant. It is the rights of the State that are being prosecuted. None of those persons were agents of or represented the plaintiffs, the People of the State of New York.

On the same general question the prevailing opinion cites *People* v. *De Simone* (225 N. Y. 261). That case held admissible a statement tending to the identification of the defendant when made by one of a crowd, within a space of seconds after the shooting, as one of the " circumstances " surrounding the shooting. The inapplicability of this case is evident. In the same connection four decisions of foreign jurisdictions are cited: *Grimes* v. *State* (68 Ind. 193, 195); *Brown* v. *State* (74 Tex. Cr. 356; 169 S. W. 437); *Garber* v. *State* (4 Coldw. [Tenn.] 161, 165, 169); *Crenshaw* v. *State* (205 Ala. 256; 87 So. 328, 330). But none of these cases has the remotest application to the one under review. In each one of them the hearsay evidence was admitted to prove unpremeditated acts and

declarations made *before* the crime was committed, and which tended to show the absence of felonious intent or evil purpose.

No one would question that the ruling last mentioned excluded only statements that were clear hearsay, and that those statements were made by the defendant long *after* the crime under investigation; but their admissibility is urged on the ground that the statements were part of the *res gestæ*, "verbal acts." It would be idle to assert that the facts, of which proof was offered, followed so closely upon the act of "seizure" as to form part of it. The limitations upon this class of proof have become now so well established by innumerable decisions in this State as to be beyond serious contention. Such statements or acts *following* the actual commission of the crime, to be evidence in a criminal trial, as a part of the *res gestæ*, must be so closely connected with it as to constitute a single transaction; must be natural and instinctive; must be so connected with the act charged in the indictment as to be calculated to elucidate and explain its character and quality, and derive credit from and be a reflection of the act charged; must be spontaneous to such a degree as to exclude reflection, or the inference of fabrication, or an opportunity therefor, a "verbal act" not dependent entirely on the veracity of the witness, not a mere answer to an inquiry, nor a narration of a past event. A few of the cases in this State that place these principles upon a firm foundation are noted (*People* v. *Sprague*, 217 N. Y. 373; *People* v. *Curtis*, 225 id. 519; *People* v. *Del Vermo*, 192 id. 470; *People* v. *Chapman*, 191 App. Div. 660; Wharton Cr. Ev. [8th ed.] §§ 691, 692). To these may be added other cases in tort ᵢ(*Greener* v. *General Electric Co.*, 209 N. Y. 135; *Waldele* v. *N. Y. C. & H. R. R. R. Co.*, 95 id. 274; *Luby* v. *Hudson River R. R. Co.*, 17 id. 131; *Eastman* v. *Boston & Maine Railroad*, 165 Mass. 342; 43 N. E. 115; *Barker* v. *St. Louis, I. M. & S. R. Co.*, 126 Mo. 143; 28 S. W. 866).

The record contains ample evidence to warrant the verdict, if believed by the jury. After all the evidence was in, the defendant through his experienced, learned and unusually able counsel, expressed his satisfaction with the charge of the court and with the jury. He admits that there is a question of fact in the case. As pointed out, there was no error committed on the trial which affected a substantial right of the defendant. (Code Crim. Proc. § 542.) The judgment should be affirmed.

BLISS, J., concurs.

BLISS, J. (dissenting). It is well at the outset to examine the jurisdiction of our court on this appeal. It is purely statutory and has been discussed many times by the appellate courts of this State. It is found under sections 527 and 542 of the Code of Criminal Procedure. Section 542 provides: "After hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties." Section 527 provides that the appellate court may order a new trial if it is satisfied that " the verdict against the prisoner was against the weight of evidence or against the law, or that justice requires a new trial, whether any exception shall have been taken or not, in the court below." To summarize, we are to do substantial justice. We must neither magnify inconsequential mistakes into reversible errors nor ignore those which have substance.

The jury are the judges of the facts and an appellate court should not substitute its judgment of such facts for that of the jury. " Extensive as is the power of review vested in this court on an appeal from a judgment of death, the law does not intend to substitute the conclusions of fact which *may* be drawn from the evidence by seven judges for the conclusions of fact which *have* been drawn from the evidence by twelve jurors, unless we are clear that the view of the facts taken by the jury is wrong. It is our duty to affirm, if the trial was fair and without legal error and the verdict was not against the weight of evidence. We are to see to it that the trial was fair and that there was sufficient evidence, within recognized rules of law, to support the verdict; this done, the responsibility for the result rests with the jurors." (*People* v. *Becker*, 215 N. Y. 126, 136.) " But the rule is now firmly established by repeated decisions of this court, that in exercising the jurisdiction conferred by section 528 of the Criminal Code in capital cases, we shall be governed by the practice regulating the review of questions of fact upon appeal to the Supreme Court, and that in such cases, if there is a fair conflict in the evidence or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption." (*People* v. *Taylor*, 138 N. Y. 398, 405.) " The weighing and consideration of the evidence is the jury's peculiar province, and it is almost elementary that an appellate court cannot disturb its finding where the issues were properly submitted to it as in this case, and particularly in a charge of the court to which no exception was taken." (*People* v. *Raizen*, 211 App. Div. 446, 452.)

The trial below stands unchallenged by the appellant as to its fairness. The jury was carefully selected and it is not urged that it was moved by passion, prejudice or any other improper motive. The charge proper was clear and without exception. The appellant was represented by experienced and able trial counsel. Upon this appeal experienced counsel represent the appellant who concede in the first point in their brief that a question of fact was presented for the jury's determination. The issues of fact have been resolved by the jury against the appellant, and it is not urged that the verdict was against the weight of the evidence.

The appellant makes three points upon this appeal, *first*, that the evidence presented an exceptionally close question of fact; *second*, that the court below erred in charging with relation to cumulative evidence; and *third*, the misconduct of the jury in using a magnifying glass during its deliberations.

The prosecution based its case in chief upon the evidence of the witness Gross, who identified the defendant as one of the participants when the crime was planned as the instigator of it, the evidence of the victim himself, who identified Strewl as having been present in the room where he was confined and the evidence of the handwriting experts who identified Strewl as the author of the ransom notes. Two of these portions of the testimony were direct and the third was circumstantial. Gross testified that Strewl was present in the Century Hotel in the city of New York and there planned the kidnapping. There were four other men besides Gross in the room at the time. This evidence is direct and positive and stands uncontradicted in the record. None of the others present on this occasion were called. Had they been available the People could not have compelled them to testify against themselves and the appellant neither called them nor showed any effort to produce them. It is likewise undisputed that in August, 1933, immediately after he learned of the kidnapping, Gross voluntarily went to the American Consul at Windsor, Canada, and revealed this transaction to the American Consul. He later reported it to persons in the employ of the United States Department of Justice. The prosecution could not have shown this fact by the Consul or by any of such persons to whom Gross delivered the information. Their names were given upon the trial by Gross but none of them were called by the appellant to contradict Gross and no effort was made to produce them, although the trial lasted for over two weeks. While the past record of the witness Gross left much to be desired, nevertheless, as was said by the Court of Appeals in *People* v. *Arata* (255 N. Y. 374): " Contradictions and polluted sources do not avail without more to vitiate the judgment or to induce a belief

that the defendant should go free, for the polluted sources were as obvious to the jury as they are to an appellate court." (p. 376.) " There can be no reversal of the judgment without breaking down the barriers that separate the functions of a jury from those of an appellate court." (p. 375.) And in *People* v. *Cohen* (223 N. Y. 406) the same court said: " For it is also to be remembered that in fixing the blame for such a crime as we are here considering the State is not likely to discover witnesses of high character."

Gross also testified that at the meeting in New York, where the crime was planned, John Oley was with Strewl. O'Connell, the victim, testified that three men who took part in the actual kidnapping and in seizing him were John Oley, Francis Oley and a man named Geary. Daniel P. O'Connell testified that John Oley was with Strewl when they met in the Ten Eyck Hotel and that John Oley stated that he came as a friend of Strewl because he was afraid that he, John Oley, and his brother, Francis Oley, might get into trouble because they were marked by the police as the kidnappers. Snyder testified that John Oley loaned him and Strewl the car with which to make the trip to New York with the ransom money and to get the victim. Snyder used the Oley speakeasy as a place to meet Strewl and on one occasion Francis Oley instead of Strewl, with whom Snyder had an engagement, met him there. Snyder, Strewl and the Oleys were associates of long standing and in constant contact with each other while young O'Connell was being held captive. O'Connell's identification of the two Oleys and Geary as participants in the actual kidnapping is uncontradicted, as is also the identification of John Oley by the witness Gross.

The victim himself positively identified Strewl as having come into the room where he was held under guard late in the afternoon of the day following the seizure. The captive testified that he was lying on his back on a bed with his left arm attached to the bed with handcuffs and with a bandage over his eyes and that he could see distinctly from under the bandage. This bandage came down to apparently the middle of his nose and he could see outside of each corner of it. He said Strewl came into the room and asked him to name some go-betweens; that Strewl walked right into the room and sat down on the bed and that he could see him from under the bandage. Strewl then went out of the room and came back again and asked O'Connell for some more names and when he told him he could name no more, Strewl told him that he better get in touch with his uncles. Strewl again left the room and then one of the guards came in the room and the victim saw him. He said that it was one of the guards that was with him all of the time he

was there. He testified that the next morning these guards changed the bandage and put cotton up under it alongside of his nose and put more adhesive tape on it, telling him that he must have been able to see because they could see him looking. On a later occasion O'Connell heard Strewl present in the room and recognized him by his voice. It is urged that it was impossible for the victim to have seen Strewl there in the place of confinement. The reply is made that O'Connell not only identified Strewl as having been in the room but he also described in great detail the other two men as well as the room itself, its bed, the dressers, window shades, curtains, rug, the grimy walls and the clean place where a crucifix had previously hung. It is likewise urged that O'Connell, on cross-examination, stated that he could not have any way of telling time as he had no watch, could not see anyway, or could not see the watch if he did have one. The witness said that he did not mean this answer in the sense that counsel for the defendant took it, that he meant he did not have a watch to see the time and that he could see when he was lying down on the bed.

Coming now to the authorship of the ransom letters, three nationally known handwriting experts were called by the People and each testified that the defendant Strewl was the author of these letters. The handwriting expert called by the defense was completely discredited. Shortly after the crime the ransom letters together with the standard specimens of writing and printing of the defendant had been submitted to him and he had given the district attorney a written statement to the effect that the defendant was the author of these ransom letters. Thus all four of the experts, three called by the People and one called by the defendant, had named Strewl as the writer of the ransom letters.

In his defense appellant offered three witnesses, the assistant district attorney, Casey, who was really recalled for further cross-examination; the handwriting expert, Hamilton, and the lawyer, Snyder. The evidence of the handwriting expert, Hamilton, has already been referred to. Snyder's testimony dealt only with Strewl's activities as the go-between, and the release of the victim.

The identification of Strewl as the one who planned the crime, was present in the kidnapping chamber and wrote the ransom letters is positive. In addition there is also the proof of Strewl's activities in conducting the negotiations between the members of the victim's family and the kidnappers and obtaining the release of the victim. It is conceded by Strewl's counsel that Strewl knew then and knows now who the actual kidnappers were, and that he made no effort whatsoever to inform the authorities as to their identity.

From this brief *résumé* of the proof it is quite apparent that the evidence amply sustains the verdict and that the appellant's first point is without merit.

The witness Snyder, who was Strewl's lawyer and claimed to be protecting Strewl's interests in the negotiations and release, was not permitted to state what his client said to him on various occasions during these negotiations when no one else was present. These statements were objected to and excluded as self-serving. Such statements were clearly self-serving. " The unsworn statements of a party offered as proof of the fact asserted in the statement are admissible against him as admissions under an exception to the hearsay rule, but such statements are not admissible in his favor, as there is no exception in such case. Statements of a party offered in his own favor are termed self-serving declarations." (2 Ford Ev. 914, § 175.) The majority hold that they should have been admitted as a part of the *res gestæ* and that failure to receive them was reversible error. At the time these statements were made the crime of kidnapping was then complete although the victim had not yet been released. There was every inducement for Strewl to conceal his true relations with the other kidnappers. It is not reasonable to suppose that he would tell Snyder the true facts unless Snyder was also a participant in the crime. With this motive for concealment and ample opportunity to make his own statements fit his own purposes they lacked that spontaneity which is the truth-giving factor to such unsworn statements and which makes them an exception to the usual rule of exclusion. An analogous situation existed in *People* v. *Sprague* (217 N. Y. 373). There the defendant had been convicted of murder in the first degree. The People were permitted upon the trial to show that the deceased after having been shot, declared to the first person seen by him after the shooting that the defendant had shot him. The Court of Appeals wrote (at p. 379): " In the case we are now considering the declaration was not so spontaneous or natural as to exclude the idea that it was the outgrowth of the threat made to the deceased by the appellant that he would get a gun and shoot him, or the idea that the deceased fabricated it. The space of time between the shooting and the declaration was considerable. The distance traveled by the deceased in going to the doorway, where the declaration was made, from where he was when shot, was substantial. The declaration was called forth by the inquiry: ' What is the matter,' and was distinctly narrative. The declaration made under such conditions was wholly untrustworthy and should not have been received." (See, also, *People* v. *Chapman*, 191 App. Div. 660.)

If we assume without conceding that these unsworn statements by the defendant were a part of the *res gestæ* and, therefore, admissible, the ruling of the court below did not affect the substantial merits of the case. These statements had no bearing upon the real questions of fact here, viz., the identification of the defendant by Gross; the identification of the defendant by O'Connell, the victim; and the identification of the defendant as the author of the ransom letters. Giving the defendant the benefit of anything that he might have said to his lawyer, Snyder, on these occasions, such statements could have had no bearing upon any of these three features of the case against the defendant or upon his actual guilt or innocence of the crime charged.

The majority opinion quotes at length from a news item published in the Albany *Times Union* shortly after the victim was released by the kidnappers. This article was not received in evidence. It was read in full by counsel for the defendant to John J. O'Connell, Jr., upon cross-examination and this witness said that he did not make the statement; that some parts of such statement were true, and that parts of it were not true at all. He was not asked to point out the various portions which were true and those which were false. When the witness Daniel P. O'Connell was being cross-examined, counsel for the defendant first started to read the newspaper statement to the witness and ask him if he made such statement to a reporter. The court, upon objection by the district attorney, ruled that the defense counsel should show the article to the witness instead of reading it before the jury. Counsel then proceeded to read to the witness portions of the article and ask him if he made such statements. The witness denied having done so. He said that he did not give out such a statement, that he did not give out a prepared statement and did not authorize anybody to give out a prepared statement. After having thus partially laid the foundation for impeachment the defendant failed to call as a witness the newspaper reporter to whom such statement purported to have been made and failed to show why he did not call such reporter. As to the possible effect of this ruling upon the jury, counsel for the defendant actually read the entire article before the jury to the witness John J. O'Connell, Jr., when cross-examining him so that its full effect was before the jury even though the article itself was not in evidence. The defendant was not prejudiced by this. That the statements to the reporter might have been privileged is urged as an explanation of the failure of the defense to call the reporter. No such privilege exists or ever did exist in our law. (*People ex rel. Mooney* v. *Sheriff of N. Y. County*, 269 N. Y. 291.)

Another error alleged by the appellant is that a reading glass was taken into the jury room by one of the officers with the exhibits and apparently there used by some of the jury in examining the exhibits. In any event it in no way affected the substantial rights of the defendant. The first mention of the reading glass is found in the evidence of the defendant's handwriting expert, Hamilton. While he was being cross-examined he was shown an exhibit and asked whether he had seen it before or not. He then, without objection, took a magnifying glass from his pocket and examined the exhibit. Immediately thereafter he was shown another exhibit and asked to identify it and he then examined this exhibit with the glass. The glass itself is an ordinary, small-sized reading glass such as is in common use as an aid to reading fine print or for slightly enlarging objects. There could be no more harm in the jury using it than for the witness to use it while testifying. Only the true facts could be revealed by the glass. The jury by using it could see only what was actually there to be seen. Under these circumstances the use of this glass by the jury was not misconduct.

The defense took no exceptions to the charge in chief. At its conclusion and at the request of the defendant the court charged that if the People had not accounted satisfactorily for their failure to call any material witness whatever, the jury might presume that if that witness were called he would testify unfavorably to the People. The court charged this in a manner that was satisfactory to the defendant. Then at the request of the People the court charged that this rule did not apply to any testimony or to any evidence of a person whose testimony might be cumulative. The appellant claims that this was error. It is argued that the prosecution did not call all of the detectives who were present at the time the defendant was apprehended and he gave the specimens of his handwriting. One of these detectives was sworn, the others were not. The one who was sworn gave a complete detailed account of all that transpired on these occasions. Of necessity, had the others been sworn, they would have been compelled to repeat the same transactions. This would have but added to the length of the trial and served no useful purpose. The appellant says that this failure to call such additional detectives was prejudicial to him in that he was not afforded an opportunity to cross-examine them. There is no duty upon a party to call a witness simply to give his adversary an opportunity to cross-examine such witness. The charge in the form originally requested by the defendant and as made, was too broad and should have been refused. There was no error in the modification. (*Van Wicklen* v. *Van Wicklen*, 142 App. Div. 507.) The appellant makes no other objection to the charge.

The majority opinion states that the comparison of the ransom notes with the standards does not convince one beyond a reasonable doubt that the defendant wrote the ransom notes. This argument might well have been addressed to the jury, as indeed it was, but that is not the rule to be followed by this court in the consideration of this appeal. " This court has no power to interfere with the judgment merely because it may entertain a reasonable doubt upon the evidence. The determination of that question is within the province of the jury." (*People* v. *Long,* 150 App. Div. 500; affd. without opinion, 206 N. Y. 693.)

This trial lasted many days. A clear issue of fact was presented. The jury's verdict is supported by the great weight of the evidence, much of which in its most salient features is uncontradicted. No substantial error which authorizes us to disturb the jury's verdict has been pointed out. Under these circumstances we have no power to reverse. The judgment of conviction should be affirmed.

As the majority of our court is reversing the judgment of conviction below and ordering a new trial it is unnecessary to discuss the proceedings relating to sentence.

McNAMEE, J., concurs.

Judgment of conviction reversed upon the law and facts, and in the interests of justice, and a new trial ordered.

HILL, P. J., RHODES and CRAPSER, JJ., concur; McNAMEE and BLISS, JJ., dissent.